**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------X

| | | |
|---|---|---|
| **United States of America** | : | **Docket No: 0207 1:18CR00098-001 (PKC)** |
| **-against-** | : | **Sentence Date: October 26, 2020** |
| **HAKMET OTHMAN** | : | |
| **Defendant** | : | |

-----------------------------------------------------X

## DEFENDANT HAKMET OTHMAN
## MEMORANDUM IN AID OF SENTENCING

### I.) Introduction

Hakmet Othman (hereinafter Othman) is 46 year old United States Citizen who is scheduled to appear before this Court for sentencing on October 26, 2020.

Othman was arrested on January 30, 2018 and released on a $150,000 secured, cosigned appearance bond, with partial release conditions, including monitoring. In addition, in the likely event a custodial sentence is imposed, the defendant has been at liberty since his arrest, and has kept all court appearances. He has also remained compliant with all terms of his pre-trial release and thus is viewed by U.S probation as a good candidate for voluntary surrender in lieu of immediate remand. He is likewise not viewed as a flight risk or present danger to the community.

On August 21, 2019 the defendant appeared before Hon. Pamela K. Chen and pled guilty to Count 1 of a two count indictment. Count 1 charges that between November 2017 and January 2018, the defendant received certain visual depictions, using a means of interstate and foreign commerce, including by a computer, the production of such visual depictions having involved the use of minors engaging in sexually explicit conduct, and such visual depictions having been of such conduct, in violation of 18 U.S.C & 2252(a)(2) and (b)(1) within the Eastern District of New York.

We are aware that Othman faces a substantial prison sentence based upon this conviction, and in no way do we seek to minimize the seriousness of the offense to which he has admitted. Rather, as discussed below there are numerous factors which the court must consider in determining the appropriate sentence including each of the factors set forth in 18 U.S.C Sec 3553(a). Moreover, prior to engaging in the instant criminal conduct the defendant has been, and continues to be kind, a loving, caring, supportive husband, and father of six children including 5 daughters. He is also the loving leader of a very large extended family, uncle to many, devoted brother, cousin, and friend. He is a dedicated, loyal and responsible worker who is highly valued and trusted by his employer. He has and continues to lead a fully law abiding life in all other respects.

A judges responsibility when sentencing anyone is undoubtedly a difficult task. As this Court is certainly aware, there are a variety of factors the court must consider in determining a

just and appropriate sentence - not simply the offense and the conviction, but the history and characteristics of each individual defendant as well. For these reasons, we have attached as Exhibit A, numerous letters from Othman's immediate and extended family, co-workers, employer, and friends which we submit provide the court with valuable insight into the individual Othman truly is. In addition, the defendant has been the subject of psychosexual evaluations conducted by Dr. Meg Kaplan in May 2018, and Dr. Alexandra Sasha Bardey in April, 2019. These reports are mentioned at various places in the PSR and discussed later herein. The entire unreacted reports from each evaluation are included herewith in order to provide the court with all information required to gain valuable insight into the defendant's sexual history and behaviors, history of sexual abuse and the relationship of that event to the instant offense, and other factors to assist the court in formulating a just and appropriate sentence. The Kaplan report is annexed as exhibit B. The Bardey report is annexed as exhibit C.s

The defendant has also attended weekly group mental health therapy sessions at the Queens Counseling for Change since May 2018. According to reporting, the defendant has attended regularly and is fully engaged in treatment. A progress report dated 8-14-20 is included here as exhibit D.

In addition, in June 2019 the defendant was referred by U.S pre-trial services to First Light Psychological Services in Queens, NY, for weekly individual sex offender specific therapy session, Reporting, which confirms that the defendant attends regularly and is fully engaged, has been included here as exhibit E.

## II.) <u>Legal Standard</u>

As this Court is undoubtedly aware, the United States Supreme Court decision in *United States v. Booker*, 543 U.S 220 (2005), has reshaped the manner in which a sentencing judge can impose a sentence. The sentencing Court must consider the guideline range, as well as any basis to depart from that range. However, the Court is no longer required to impose sentence within that range. In fact, the federal sentencing guidelines are but one factor among several in determining an appropriate sentence. *Kimbrough v. United States*, 128 S.Ct.554, 574 (2007). The guidelines are only the "starting point and initial benchmark…" *Id.*, (*citing* Gall v. *United States*, 128 S.Ct. 586, 596 (2007). It is the sentencing judge who has the advantage of familiarity with details of the case and can best evaluate the import of the 3553(a) factors. *Id.*

In determining a sentence that is "sufficient, but not greater than necessary," the first of those factors the judge must consider is "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C 3553(a)(1). Without a doubt, the breadth of this factor alone extends far beyond the guidelines and implores the sentencing judge to consider the unique circumstances and characteristics of the defendant in each case. A consideration of those characteristics, along with the remaining seven factors, may render sentences that do not fit within

the guidelines, yet are moored in fairness and come closer to the goals of sentencing

set forth in sec. 3553 (a)(2). *United States v. Ovid*, 09 CR 216, slip op. 3 (EDNY, Oct.

1, 2010).

Therefore, the Court may not simply presume that the guidelines range is

reasonable. Gall, 128 S.Ct at 597. Rather the Court must make an individualized

assessment based on the facts presented. From its unique vantage, the Court may

conclude that, despite the guidelines, "in a particular case, within-Guidelines sentence

is 'greater than necessary' to accomplish the goals of sentencing…" *Kimbrough*, 128

S.Ct. at 570 (*citing* 18 U.S.C. 3553(a)). The not "greater than necessary" language of

the federal sentencing statute incorporates the need for sentence to "reflect the

seriousness of the offense," "promote respect for the law" and "provide just

punishment for the offense." 18 U.S.C 3553 (a). Indeed, as the Supreme Court

suggested in *Gall*, a sentence of imprisonment may not promote respect for the law if

it appears unduly harsh in light of the real conduct and circumstances of the particular

case. *Gall*, 128 S.Ct. a 599; see also *Rita v. United States*, 127 S.Ct. 2456, 2456

(2007) (observing the district court may consider arguments that "Guidelines sentence

itself fails properly to reflect sec.3553(a) considerations").

[1] The seven other factors are (1) the nature and circumstances of the offense; (2) the history

and characteristics of the offender; (3) the need for the sentence imposed to reflect the goals of

sentencing set forth in 3553(a)(2); (4) the kinds of sentences available; (5) the commission's

policy statements; (6) the need to avoid unwarranted sentence disparities among similar

defendants who commit similar crimes; and (7) the need to provide restitution to victims. *See*

U.S.C. 3553 (a).

## III.) <u>Statement of the Offense and Othman's Participation - Acceptance of Responsibility</u>

### a.) <u>Offense Conduct</u>

As previously stated, on August 21, 2019 Othman appeared before this Court

and pled guilty to Count 1 of the 2 Count indictment. Count 2 remains open. The

defendant also agree to the forfeiture allegations.

### b.) <u>Othman's Participation</u>

The defendant acknowledged that between November 2017 and January 2018,

while in Staten Island, New York within the Eastern District, he knowingly and

intentionally received more than 600 visual depictions of child pornography using a

computer to receive such depictions of minor children engaged in sexual activity

including material involving pre-pubescent children, and material portraying the sexual

abuse of an infant or toddler, all of the above affecting interstate and foreign commerce.

### c.) <u>Acceptance of Responsibility</u>

Othman has clearly demonstrated acceptance of responsibility through his sworn plea allocution, the averments contained within the foregoing paragraphs, as well as his conduct following his guilty plea including efforts at therapy, treatment, and rehabilitation.

### IV.) <u>Stipulated Guideline Analysis</u>

Pursuant to a written plea agreement, at page 3, the parties have stipulated to a total offense level of 33. Further, it is agreed that if there is a clear and prompt acceptance of responsibility on the part of the defendant, a 3 level reduction is warranted pursuant to USSG Sec 3E 1.1(a)(b). The parties further agree (as does U.S probation) that the defendant has zero criminal history points resulting in a criminal history category of I. Thus based upon these calculations, the defendant's guidelines range is stipulated to be 97-121 months of imprisonment.

The defendant is aware of the entirety of sentencing options set forth at Part D of the PSR, more specifically, that he faces a statutory mandatory minimum term of 5 years imprisonment with a term of 5 years to life of supervised release following the custodial portion of the sentence together with all other options set forth at paragraphs 76-94 of the PSR.

## V.) <u>History and Characteristics - Personal, Family, Vocational Information</u>

We are in receipt of the PSR dated May 29, 2020 and have undertaken a careful review of its contents. Set forth at Part C, paragraphs 40-75 is detailed information concerning Othman's personal offender characteristics. The information contained in the PSR is accurate in all respects and is fully adopted herein.

What emerges is the portrait of a loving, caring, supportive, kind, thoughtful, and hardworking man, one dedicated completely to his family and focused entirely on providing for his children and insuring that they have every opportunity to lead fulfilling and successful lives. He has dedicated himself completely to insuring that his children have more opportunities in life than he had and his wife Deena enjoyed as they struggled after an arranged marriage when they were both very young. What is also clear is that the defendant has endured numerous difficult periods in his life including being subject to an emotionally and physically abusive father for many years, as well as the trauma of child/sexual abuse at age 7 as detailed in the attached reports. In this regard, in his report Dr. Bardey explains that "because Mr. Othman endured traumatic sexual abuse at a young age, it is my opinion that his sexual development was derailed from that point onward, due to his forced repression and lack of appropriate intervention. This deviation has manifested in Mr. Othman's habitual-nearly obsessive-viewing of pornography; his promiscuous sexual behavior during late adolescences and early adulthood, exhibited by numerous extramarital affairs; and most recently in his attraction to images and videos of young

girls, which is indicative of the association between his childhood sexual trauma and his sexuality."

As mentioned the defendant is well respected and revered in his immediate and large extended family. Indeed, as news of his arrest and prosecution became more widely known, our office was contacted by many members of his family and other supporters offering help and assistance, and willing to take the time to express their thoughts, experiences, and anecdotes with Othman in an effort to illustrate his true character for the Court to consider in the formulation and imposition of an appropriate sentence.

In this regard we have attached numerous letters in support of Hakmet Othman notwithstanding his serious criminal transgression. We could have provided more, but in the interests of preserving the Court's valuable time, believe the attachments are more than sufficient to illustrate the point.

Over and over the same words are used to describe the defendant…kind, caring, loving, supportive, thoughtful, and hard working. One letter, particularly poignant and insightful is worthy of quoting directly herein as is sums up who the defendant really us more accurately then I could ever do;

Amena Othman, 25, the eldest of the defendants six children (5 girls) writes to the Courts as follows:

Honorable Pamela K. Chen,

My name is Amena Othman and I am the eldest child of Hakmet and Deena Othman. I am writing today to request leniency in the sentencing of my father, Hakmet Adnan Othman. Coming from someone who has known the man longer and better than most people, I cannot express enough how much he means to me, my family, and so many others. I am aware of the mistakes my father has made and I know he understand them as well, but I am writing in hopes that you will see my father in the way that I see him and can understand that there is much more to him than his mistakes.

As the eldest child of both my parents I was never ready for most of the steps in my life. I did not have older siblings or even many cousins around to be able to watch them go through things first. I was always first. Everything I did was also new to my parents. As a first generation college student I did not fully know what to look forward to. My parents came with me to student orientation, family day, and they did absolutely everything they could to try and experience this step in my life with me. It was hard on them because I was two hours away from home and they did not understand how to handle it. In the community my parents were raised in, it was not common for kids of our background to even attend college let alone attend one far away. This especially was rare among women. My father was always asked by the men in our family why he allowed his daughters to attend colleges in other cities, have jobs, and even have social lives. Although his immediate response was that so he wouldn't have to pay bills when he got older since his kids should turn out successful through education, he made it clear to everyone around him that he did not believe in such restrictions and boundaries that were once placed on those of his generation, but that he believed that his family came to America for a better life and this is the kind of life that they were hoping for. Throughout college I have interned for places like the Mayors Office of Community Affairs and Amnesty International, while also participating on Government Official Campaigns, and staying active within student life. I was an award winning executive two years in a row while I held the title of President of a human rights organization, I graduated Cum Laude with a Bachelors in Political Science, and was accepted into Columbia University for Graduate School. Not to brag about myself, but my father raised a pretty decent kid in a world where many kids don't turn out as decent. The only thing I can wish for now is that I can raise my children just as well as he raised me and my siblings.

After graduating college, I got married and am now a mother of two. All I think about now in days is how I cannot wait to experience and stand by my children throughout all of their first steps in life the way my father did for me. We would have to have an endless conversation in order for me to express how great of a father and man my father truly is, however for now all I can say is that I can never be more thankful to have such a loving, hard working, and family oriented father. I am grateful for the memories I have of a wonderful childhood and an eventful uprising and although you do not have the memories I do, I hope you can understand that no truly terrible man can leave such a loving impact on his families heart the way my father has put on ours. So please, do not see my father for just his mistakes for he is more than that to so many people.

Sincerely,

Amena Hakmet Othman

# VI.) __Conclusion__

Hakmet Othman stands before the Court for sentencing following his conviction for receipt of child pornography in violation of federal law. We believe he is a worthy candidate for a sentence well below the stipulated guideline range. We respectfully urge the Court to sentence him to the required minimum mandatory sentence of five years imprisonment, as such a sentence would be sufficient, and not greater than necessary, to accomplish the goals of sentencing.

From the moment he was arrested he has accepted immediate unconditional responsibility for his conduct, and has never wavered. He is 100% responsible for his own bad judgment. Notwithstanding, what has also become clear as we have learned more about him, is that he remains a loving father, valued member of his community, and a low risk of danger to others. The attached letters of support from his children also make clear that he is not a danger to children, rather, he is a cherished source of love and support and has been instrumental in their success. He is a devoted patriarch to his large close knit family and largely because of his presence in their lives they have thrived. As indicated, each of his six children have written letters in support of their father. We submit that they are his best advocates. They make clear that they love and appreciate the support and guidance he has provided to them their entire lives.

All of the other references also speak glowingly about Mr. Othman. They make clear that he is a loving father, hard worker, and extremely remorseful about his conduct. All of the people

in his life love him and credit him with success in their lives. He is not dangerous. He is a

positive force in people's lives. He is also the main financial breadwinner for his family. His

extended imprisonment would be financially devastating and result in extreme prolonged

hardship. All of these people have vigorously stood by him notwithstanding his crimes. They

have struck a balance between the kind and caring person he was prior to engaging in the

criminal conduct that has defined him more recently. They have given considerable weight to the

former, as well as to his efforts at treatment and therapy, which have provided him with insight

into his conduct and its impact on others.

We respectfully urge the Court to strike a similar balance in considering all the factors to

be weighed in the determination and imposition of an appropriate sentence. Please consider his

entire life, not just the recent and regrettable past, in fashioning a fair and just sentence.

It should also be noted here for the Court to consider that his daughter Nadia, as well as

his father, are both dealing with very serious health challenges at present. First, his daughter

Nadia has a large lymphangioma in her abdomen. The tumor is benign at this moment but could

continue to grow and become malignant if not treated. At present it takes up the majority of her

abdomen with vital arteries running through it. It causes extreme discomfort and swelling. A 3

day hospital admission was recently required. Continuous scans are necessary to monitor its

progression until a doctor can be located, willing to attempt to remove it. Until now no doctor

has expressed confidence that it can be safely removed leaving Nadia in a very difficult situation.

In addition, Othman's 74 year old father was struck by a car and hospitalized for 7 months. He also has renal failure and severe dementia which is getting progressively worse as time goes by. His physical and mental health is failing rapidly. The defendant is a critical part of his care and management system. The appointments and related obligations are overwhelming and the  defendants extended imprisonment would again result in extreme personal hardship for these family members.

Moreover, there are several additional considerations that reinforce that ***Othman is not a threat to the community and that his offense conduct is directly caused by childhood sexual abuse he endured at age 7.***

Dr. Kaplan's psychosexual evaluation report concludes "Mr. Othman is a low risk to commit another sexual offense and that he could easily and safely be treated in the community under the usual conditions of supervision by federal probation"

Likewise, Dr. Bardey concludes following his comprehensive evaluation "that Mr. Othman suffers from the ongoing symptoms indicative of a trauma related disorder due to the abuse he endured as a child, which were left unacknowledged and untreated until his arrest for the instant offense. ***The impact of childhood sexual trauma on his sexual development significantly impacted his judgement and decision making surrounding his offense conduct.*** Bardey states further "Since his arrest, as attested to by his current group therapist and as manifested during his examination Mr. Othman has begun to address the psychological

underpinnings of his offense conduct. By acknowledging and addressing the sexual abuse he

endured as a child, he is working towards removing the key psychological factor that contributed

to his offense conduct." Dr. Bardey recommends that Mr. Othman continue to explore treatment

in order to gain further understanding of the psychological underpinnings of his offense conduct

and to develop mechanisms to better interact with the community. In this way, Mr. Othman's risk

level can be immensely mitigated and he would pose a low risk to the community". Dr. Bardey

points out that his risk to reoffend is actually mitigated by his amenability to treatment, which he

has expressed and demonstrated through his participation at Queens Counseling for Change and

First Light Psychiatric Services.


Lastly, while true that Mr. Othman admitted attraction to and viewed images of underage

girls, there is no evidence or suggestion that he ever acted on this attraction beyond looking at

images. In fact, as stated he is the father of six children each of whom have praised him as a

father and provider.


Accordingly, and for all the foregoing considerations, and in the interests of justice, it is

respectfully urged that the Court sentence Mr. Othman below the stipulated guidelines range to a

period of five years imprisonment with 5 years of post release supervision. The Court's kind

consideration is sincerely appreciated.


Respectfully Submitted,

Leo V. Duval



Honorable Judge,

My name is Deena Othman, the wife of Hakmet Othman.

I am writing to you in hopes that you would be lenient in sentencing my husband.

I know what my husband did was wrong. There is no excusing his mistakes. I also believe that his traumatizing past led him to those mistakes. Again, I am not excusing my husbands actions, but I want to make clear that his actions came from a place of trauma. What he went through was something that no one who hasn't been through something similar will ever understand. The fact that he went through what he did and never spoke of it means he never dealt with his past. He was not able to cry about it, speak about it, or even get any sort of closure. It took over four decades for this to ever make its surface again.

When you are someone's wife and you find out something horrifying has happened to them when they were younger, you pay for attention to how to help them rather than pay attention to his actions that took place because of them. I understand that is not how you are supposed to think. I understand you are to place punishment for his actions and I believe you should. However, I ask you to take into consideration not just my husbands past, but the much worse man he could have become because of it.

Yes, my husband and I got married young. We were both babies doing what our parents told us to do. The community we grew up in thought it was better for us to grow up faster that way we made less mistakes as children and in some cases they were right. Although I wished things were different for us, we were able to build a better life for our children and even ourselves. My husband was not like many conservative men in our communities. He allowed me to work and go to school after my own parents didn't want me to. He did the same for our daughters even when people tried to convince him otherwise. We gave them lives that we only wish we were able to experience at their ages. They are educated and kind human beings that are growing up and experiencing the world at its fullest and that is because of my husband. He could have been a man that trapped us away from what life had to offer us all, but he didn't. He allowed us to experience it at his side.

My husband never hurt any of us. He never caused any pain to me or my children. I would not be here defending his actions if I had any doubt in my mind that he hurt one of my children because like all mothers they come way before him. My husband is the rock of this family and I beg you to do the best that you can to not keep him from us. Please be lenient in his sentencing and allow my husband to become the better man that I know he is.

Sincerely,
Deena Othman

Honorable Pamela K. Chen,

My name is Amena Othman and I am the eldest child of Hakmet and Deena Othman. I am writing today to request leniency in the sentencing of my father, Hakmet Adnan Othman. Coming from someone who has known the man longer and better than most people, I cannot express enough how much he means to me, my family, and so many others. I am aware of the mistakes my father has made and I know he understand them as well, but I am writing in hopes that you will see my father in the way that I see him and can understand that there is much more to him than his mistakes.

As the eldest child of both my parents I was never ready for most of the steps in my life. I did not have older siblings or even many cousins around to be able to watch them go through things first. I was always first. Everything I did was also new to my parents. As a first generation college student I did not fully know what to look forward to. My parents came with me to student orientation, family day, and they did absolutely everything they could to try and experience this step in my life with me. It was hard on them because I was two hours away from home and they did not understand how to handle it. In the community my parents were raised in, it was not common for kids of our background to even attend college let alone attend one far away. This especially was rare among women. My father was always asked by the men in our family why he allowed his daughters to attend colleges in other cities, have jobs, and even have social lives. Although his immediate response was that so he wouldn't have to pay bills when he got older since his kids should turn out successful through education, he made it clear to everyone around him that he did not believe in such restrictions and

boundaries that were once placed on those of his generation, but that he believed that his family came to America for a better life and this is the kind of life that they were hoping for. Throughout college I have interned for places like the Mayors Office of Community Affairs and Amnesty International, while also participating on Government Official Campaigns, and staying active within student life. I was an award winning executive two years in a row while I held the title of President of a human rights organization, I graduated Cum Laude with a Bachelors in Political Science, and was accepted into Columbia University for Graduate School. Not to brag about myself, but my father raised a pretty decent kid in a world where many kids don't turn out as decent. The only thing I can wish for now is that I can raise my children just as well as he raised me and my siblings.

After graduating college, I got married and am now a mother of two. All I think about now in days is how I cannot wait to experience and stand by my children throughout all of their first steps in life the way my father did for me. We would have to have an endless conversation in order for me to express how great of a father and man my father truly is, however for now all I can say is that I can never be more thankful to have such a loving, hard working, and family oriented father. I am grateful for the memories I have of a wonderful childhood and an eventful uprising and although you do not have the memories I do, I hope you can understand that no truly terrible man can leave such a loving impact on his families heart the way my father has put on ours. So please, do not see my father for just his mistakes for he is more than that to so many people.

Sincerely,
Amena Hakmet Othman

Dear, to whom it may concern,

Hi, my name is Medina Othman, I am 13 years old, and I am Hakmet Othman's youngest child. My father has always had a positive impact on my life. He has always pushed me to do my very best and has always been one of my biggest supporters in everything I do. My dad works hard to make sure I get a good education and to make sure I have the best childhood/life possible.The last thing my father would ever do is try to hurt us in any way. My father has always made me feel safe and do everything he can to protect me and the rest of my family. Since I am only 13 I would never want him to miss too much of my life because he is such a big part of it. There is so many more things that my father has done to help me and the rest of my family.

Sincerely, Medina Othman

Dear Judge,

*My name is Mecca Othman and my father is Hakmet Othman. My dad is a very great guy. He is honest, kind, loyal, funny, and he has a great smile. My dad is the best father I can ever ask for. When I was little he used to let me act like a cashier in his old store. Some people used to give me a dollar for a tip and my dad let me pick any snacks for free if I wanted. My dad loves cars and every car he got I would work on it with him everytime and I made sure I was there every time I saw him fix any car. Everytime i would help him with the cars it was so much fun. And we would clean his car and sometimes other people's cars every sunday. No matter what he can always make me laugh. Before my sister's amena wedding me and my dad were talking about how we had to dance. My dad started to say how he can dance so well and to prove it he broke out and started dancing . It was so funny and he is a very good dancer. Most of my favorite memories are with my dad. He is a great person. One time when my dad got his first hummer it was like an army truck if u dont know what it is. It was a very old car but my dad was determined to fix it and I helped him and one time we drove around the block with no doors, no seatbelts and we had so much fun we only drove it around the block because my dad said we would get in trouble. But right when we got home my mom yelled at us but my dad still made us laugh and after she yelled at us we continued to fix it and we just had so much fun. Another fun memory was when my dad after we were done cleaning the cars in the summer it would be so hot so my dad would just turn on the hose and just chase us with the hose and spray use. It was so much fun. We did that almost every summer for years. I looked forward to doing that anytime with my dad. I would just have so much fun. When i look back at all these memories i just know that he is one of the best people in the whole world and i don't think anyone can make me smile the way he can.*

Sincerely,
Mecca Othman

To the Honorable Pamela K. Chen,

My name is Mohammed Othman and I am the son of Hakmet and Deena Othman. I am sixteen years old and am the only son of six siblings. Because I am the only son, my go to person in my family has always been and will always be my father. I understand my father has made mistakes in his life, however I am writing to you, Your Honor, in hopes that you will understand that my father is a kind-hearted and hardworking man.

There are so many kids my age running on a terrible path and without my father I could have been one of them. When I was six years old, my dad signed me up for baseball because at the time I was a huge yankees fan. He brought me to every game and helped me at home when I needed to practice. I noticed how tired he looked a lot. My mom would always remind us to be grateful for him because of how much he does for us. He worked a lot, most of the time even had more than one job, but no matter how much he did work, every time he would come home, he would sit down with me and my sisters and start asking about our days. When I turned eight, I wanted to play football like my older cousins. Practices were around the same time as baseball practices which made it difficult to do both. Although my dad made it work traveling between one practice to another, I had to eventually chose one. I choose football and it was the best decision I made. My football team practiced in a pretty bad area. There were a lot of older kids and adults in the area doing and selling drugs, cursing, and fighting. Although my dad hated the area we were in he knew I loved the sport and continued to let me play there and he never missed a practice with me. Although I am no rich kid, I was a lot more privileged than the other kids on my team who lived in the

neighborhood that I practiced in. My dad knew that too. A lot of times the parents of the other kids couldn't come to games or practices, so my dad promised to watch over them. Most practices he would take us all out to eat after. The team would travel a lot in and out of the state and it was hard for my coaches to get buses so my dad offered to carpool a lot of us. He would rent a huge van and would drive to wherever we had to go. He would also take responsibility for the kids whose parents couldn't attend. Every year my team made it to the state championship in Florida. Instead of having some of my teammates worry about money on plane tickets, my dad would drive 20 hours to Florida that way a lot of us were able to go. He had no problem doing this for my team because he knew what it meant to me.

I understand what my father has done and I know he understands it as well. I am not here to tell you he is perfect because he isn't. But, I am here to explain to you that I am one of the many people that know the ins and outs of my father and I know the real man that he is and is trying to be everyday. That man is kind-hearted, hardworking and family oriented. Please try and understand the good in him that I have the privilege of knowing. Like the rest of my family, I am asking you to be lenient in his sentencing because without my father, my family is going to suffer tremendously.

Sincerely,

Mohammed Othman

Honorable Pamela K. Chen,

My name is Rowyda Othman and I am the second eldest daughter of Hakmet and Deena Othman. Recently my father has committed a crime and has taken full responsibility for his actions. I too understand that what he has done was a grave mistake on his part, however, I, along with all those who love my father, are requesting you to be lenient with his sentencing.

It is understandable how one mistake can create or change your perception of someone and when I found out of my fathers mistake, my perception of him was tainted. However, one cannot forget that there are no perfect people in the world. Parents are always close to perfect in the eyes of their children so when some things go wrong, it takes a toll on them, as it did in the situation of my father. When I felt at odds with my fathers mistake I looked back at the man who raised me and remembered the amount of good he has done for those he loved. I remembered the man who use to work outrageous hours driving rude people around New York City in order to afford a home for his wife and six children. I remembered the man who lashed out on his own family members who were not for educating their children and allowing them to grow into society. I am a young girl who goes to college two hours away from home and works in an environment where people think is no place for women. Although my father, like any other father, gets worried sometimes about what I do, he has supported me all the way. Thanks to that kind of support, I am graduating college a year earlier than average students and I already have a job waiting for me when I am ready. My father makes jokes on how he only allowed us to be educated and successful because he wants to retire early and leave the bills to his kids, however my

siblings and I know that isn't it. My father didn't get to have an education. My grandfather was a strict man who forced my father to work the second he was able to. Education was not prioritized in the previous generations, however my father made sure to prioritize it in his own children. My father was not a man of rules, but a man of advise. He was a man who lectured rather than ordered and at the end of every conversation I had with my father, he expressed his support in everything we did no matter what it was as long as we had our hearts in the right place.

My father raised me and my siblings the best way he could and I could proudly say he did one heck of a job. I know that he has made mistakes and he knows it as well, however I also know that he isn't the man that should be characterized by only those mistakes. He should be seen as the man who raised six wonderful kids who have done no harm to society because they weren't raised to do as such, he should be seen as the man who worked endlessly and tirelessly to afford a good home and give those he loved a great life, and he should be seen as the man who although has made mistakes, deserves a chance to continue being the great husband and father that he usually is while also working to better himself.

Sincerely,

Rowyda Hakmet Othman

Honorable Judge,

My name is Nadia Othman and I'm the third oldest daughter of my father, Hakmet Othman. I know you don't know much about my dad except for the charges he has before him, so I understand that it is hard for you to look at him and see that he is a good person who has made a few mistakes. I am fully aware of the fact that my father knows the severity of his crimes and he takes full responsibility for his actions. With the psychologist he's been seeing, and the house arrest, it has turned him into a new and better person who now values life, freedom, and doing the right thing. I'm thankful for the new person he has become and I am glad he is turning over a new leaf.

However, I'm scared for him to go to jail and come out a completely different man for the worse. I ask for the most lenient sentencing you can give my father in hopes that he can continue to work on himself without going through harsh punishments.

I'm a senior nursing student at Wagner College, soon to have my bachelors in nursing. I feel like some people don't deserve jail time but instead need psychiatric help for the crimes they've committed. I hope you choose to not keep him in there for long, better yet, at all if you have the power to do so, because I know it'll take a toll on him and potentially turn back the process he's made in the last two years.

My older sisters and I have had the privilege of our father being there to help us grow up. My eldest sister is married with children and my second eldest is engaged with a great career ahead of her. However, my little sisters are only 13 years old. They need their father to raise them the way he raised us. They shouldn't have to grow up knowing their father was in jail for an important time in their lives. I don't want that to be their story. Please don't put him away for too long. I hope you understand the tough place we are all in.

Thank you,

Nadia Othman

Layla Abdelaziz
300 Ashland Place Apt 26G
Brooklyn, NY 11217
November 27th 2019

To Whom It May Concern,

My name is Layla Abdelaziz and I am the niece of Hakmet Othman. I would like to start off my saying that I have known Hakmet my entire life and I trust him undoubtedly. He has never made me feel uncomfortable, and he has always treated me, my sisters, and mother with respect.

I don't have many intimate memories with Hakmet out side of him driving us home on weekends, buying us snacks, and telling us to go to bed when we would sleep over his home. Though this can sound off putting, it speaks volume of his respectfulness. Were his daughters cousins and he was respectful to us and made us feel at home without crossing any boundaries. There have bee countless times that his daughters have told us stories praising their father. The amazing things he has done for them and the times he was there for them when they needed him too was remarkable.

Due to parents divorce when I was really young, I do not have many close uncles so I consider Hakmet to be one of my closest. I do not need long intimate conversations to know that he considers me family.

Nothing about Hakmets character has ever seemed predatory to me. This whole situation seems very out of character for him. In my opinion a predatory man is a man with no restraint or self control and I do not see that kind of man in Hakmet. I ask that you are lenient when sentencing him and beg for his families sake that he is not away from them if not all, then for long.

Thank you,
Layla Abdelaziz

Leena Zahriyeh
300 Ashland Place Apt 26G
Brooklyn, NY 11217
November 27th 2019

To Whom It May Concern,

My name is Leena Zahriyeh and I am the sister in law of Hakmet Othman. I have known Hakmet since I was 12 years old when he was getting married to my older sister. I have watched him become an imperfect man with self-respect and morals. He is a man who has not just raised six children wonderfully, but a man I trust with my own three daughters.

My daughters are close in age with Hakmets children, however if it weren't for Hakmet, they would not be as close as they are. Although they are close in age, I have always lived farther from my siblings making it hard for my children to see their cousins. Nearly every weekend, Hakmet would come pick up my daughters so they could spend the weekend at his house. I allowed Hakmet to spend that time alone with my daughters and never felt an ounce of doubt that he wouldn't keep them safe.

I am a single mother of three beautiful young girls and I understand my responsibility to raising them and keep them safe. I also understand the paralyzing fear of having someone take advantage of my daughters. I say this to make it clear that I understand why this situation is being handled with such rigor. In fact, it is reassuring to know that these situations are being looked at in length. However, I am not worried for Hakmets sake because I am aware of his character. I would have never allowed my daughters to be alone with him if it meant putting them in any sort of danger.

I understand the gravity of this situation, and I do not have it in my t cover up any crime of this sort. Hakmet is not a bad man, or a man who takes advantage of anyone. He is a man who respects himself and his family, and would never do anything intentionally to dishonor them. But no human lives a life free of missteps. I conclude with hopes that you are lenient with his sentencing for the sake of his family.

Sincerely,

Leena Zahriyeh

Manwa Abdelaziz
300 Ashland Place APT 26G
Brooklyn, NY 11217
November 29th 2019

To Whom It May Concern,

My name is Manwa Abdelaziz and I am Hakmet Othmans niece due to his marriage to my maternal aunt. I am writing to you today to ask for you to grant leniency towards my uncles sentencing.

Being a young woman living in New York City, I have instinctively become weary of men; distrusted until they prove they can be trusted. I am a member of the NYPIRG and has worked as a youth tutor since I was fourteen. Most of my career and all of my volunteer work has been working with children. I love all my students, former and current, nearly as much as I love my little sisters; I mean, no one goes into education for the money. That being said, I understand the severity of my uncles charges and they do not define his true character.

I do not remember not knowing my uncle since he was married to my aunt before I was even born. I remember he being the one to pick me and my sisters up most Friday's after school so we could go sleep over his house to hang out with his daughters; the eight of us would not be as close as we are if it weren't for him allowing us in his home. Before he would drive us to his house, we stopped at the deli and picked out whatever we wanted. He would make jokes and sing to the songs on the radio; making us extremely comfortable with him. When we would sleep over, he made sure we had everything we needed and there was not a moment that we did not feel safe with him.

My mother was always extremely protective of us. We were never allowed to sleep over anyones house. My uncles home was the only one that met her standards, so we spent a lot of time with their family growing up. His daughters have always spoke so highly of their father and the fact that my mother allowed us to be alone with him as he drove us home made me feel like I can trust him to take care of us.

Hakmet is a respectable man. I've always seen him work hard and seen how he takes care of his daughters, and how well he treated me and my sisters. A family man, and someone trustworthy. I know that no one is perfect, but Hakmet is not a predatory man; and that is something I can say with absolute certainty.

I write this to you with hopes that you would consider being lenient with my uncles sentencing as he is not a man that deserves a harsh punishment.
Thank you,
Manwa Abdelaziz

To Whom It May Concern,

My name is Yousef Othman and I am the younger brother of Hakmet Othman. Through out my life my older brother has always been there for me and anybody who needed help. I am well aware of what my brother has done and I know for a fact that he is aware of his mistakes as well. However his mistakes, He is a good brother, father, husband, and cares for whoever is around him.

Since I can remember, my brother has always taught me what a father would teach his son. Hakmet and I are twenty two years apart and because of that he was always more of a father to me than a brother. He has done nothing but guide me. Hakmet is funny, creative and is great company. He is the kind of man that thinks he can fix everything. He was always the rock to our family. No problem would pass us without my brother finding a solution to it.

Hakmet has recently become a grandfather to a second grand child from his oldest daughter. I have never seen such joy in his eyes once they land on those kids. Hes a very proud father and now an even happier grandfather because he knows he has done right by his children for them to get as far as they have. I truly feel I can never be too far away from my brother for a long period of time

because of how much I always need his company and his advice.

I understand the consequences that my brother is facing due to his mistakes, however I, along with everyone that knows and loves Hakmet as much as I do, plead you to be lenient with his sentencing.

Thank you,

Yousef Othman

Dear Honorable Pamela K. Chen,

My name is Subhi Othman and I am writing to you concerning my uncle, Hakmet Othman. I can start by saying that I am in understanding of the charges against my uncle and I also understand that he feels nothing but regret for his mistakes.

I have many uncles, however Hakmet is certainly my favorite. I am not just saying that because of his situation and I will explain why.

My uncle is the kind of guy who you can count on to put a smile on your face no matter the kind of day you are having. He use to take us everywhere when we were younger because he valued always having family together.

When we became old enough, my uncle allowed my brothers and I to work in his supermarket. We would stock shelves and learn the value of money. Till this day I still use the tips he taught me to save my money and one day soon invest.

He put us to work to keep us out of the streets. When my brothers were in high school my uncle helped pay for them to play high school football because he knew it would keep them out of trouble and also allowed them to have fun.

Unlike a lot of fathers where we come from, my uncle always was passionate about school. Putting us in sports helped us keep our grades up because he knew we wouldn't be able to play if they weren't good. He did the same with our work. He never let us help out in the supermarket if my mother told him we got a single bad grade. My family and I were always grateful for what he had done for us. He always took care of us, allowed us to stay in his home when we needed to, and kept me and my brothers out of trouble. Even now he calls me so often to make sure I'm ok and asks about what I'm doing in life, he sticks around in our lives and I will always be grateful. He is my second dad and because of all these reasons I truly hope that you are lenient in his sentencing. Please take my words into consideration.

Best,
Subhi Othman
917.847.1036

Honorable Pamela K. Chen,

I am Miriam Othman, the niece of my uncle Hakmet. I have complete knowledge of his charges and what he has done. I understand what he has done is wrong, and believe he is a better man now. I'm happy to offer an endorsement of my uncle Hakmet's good character.

All my life I have seen Hakmet put his family first. Provided, loved, cared and most importantly pushed his children to be the best they could be. I go around so often to know this. He is a great father, husband, grandpa and uncle. I'll always remember when my sister ripped her elbow open on a gate. He was the first to run to take care of her, he was comforting her the whole ride to the hospital, making sure she forgot she had a hole in her arm. He has alway been so caring. He brings light to every situation, and is loved by so many. Hakmet has always been an amazing person to be around. He has never failed to be there for others when they need him to be. I see this man pray daily now, give advice to his family, and spend time with his family as much as he can.

It's unfortunate that he has made some bad decisions that resulted in this case. I know he is ready to take responsibility for his actions. I believe he will become a better person. I see Hakmet have deep remorse in making this mistake, and I have no doubt that he will pay his debt to society.

I hope that the court takes this letter into consideration for when it is time for sentencing. Despite his mistake, I truly believe Hakmet is a good human being.

Thank you,

Miriam Othman

Honorable Pamela K. Chen,

I am Amin Othman, nephew of Hakmet Othman. I am aware of his crimes and would like to speak on behalf of his good character. I would like to acknowledge although his crimes were wrong, that in the process of this trial and period we have seen his regret and repentance in the way he's trying to make it up to his family.

Hakmet Othman is genuinely someone I look up to in life in several ways and when I'm older, to be lucky to be half the man he is. What he has done does not take away anything the good in his life. He is an excellent father and husband to his family and I aspire to be that. He is brave and a good provider. I have had many people in my own life put me down and he has been there for me more then my own family and has even gone as far to defend me and stand up for me in multiple occasions where my family has turned a blind eye. For me he's not just an uncle, he's like a father to me and I would entrust him with my own life as well as my future kids. I have a certain memory of when I was growing up and felt as if I was going to do nothing with my life and ashamed of who I was. I remember him grabbing me by the shoulder looking at me with such pride and telling me "Don't ever talk about yourself like that, you could do anything you want in life and no one will ever get in your way. You are smart and strong." Being so young and hearing those words from him has gotten me through so much in life and now I have gotten my bachelor's degree from Hunter College and onto my Masters. He's been supporting me and proud of me for as long as I remember which that means the world to me. I have seen this man prove his love and energy to his children and family more than anyone I could imagine, he has a rough exterior but on the inside is a man with a heart of gold. In the end of the day what he did wasn't right but we all have a negative fault in life but the good outway the bad and that needs to be acknowledged even more. There is too much to lose from a great man so I write this not only for him but for me, his wife, his children. I do hope the court takes this letter with deep consideration because without him directly in our lives it would take a toll on us all.

Thank you,
Amin Othman

**Honorable Pamela K. Chen,**

My name is Diana Othman. Hakmet Othman is my brother in law of 26 years. He is my sisters husband and the brother of my husband which makes us very close. I understand that he made a big mistake, but I know deep down he is a great person and has been improving himself everyday. Despite everything that he has done, I trust him with my children as he was and will always be a big part of their lives. Hakmet is a person I could always count on no matter the time and place. There has been many instances where I would be stuck somewhere far from home and my car would be acting up. I have little knowledge about cars so my brother in law would always be the first person I call. There wasn't a single time where he would leave me hanging. Every time he was there to help me. This doesn't come close to the amount of help my brother in law has given me regarding my sons. He has given them jobs, helped them play sports and kept them out of trouble. He has always been a wonderful uncle to them and an even greater father to his own children. His daughters successes have shown for that.

It hurts us all to see him in this position because we all see how hard he is working to better himself and keep his family strong and not be in need of anything physically and mentally. When I see him I see the regret and fear and remorse in his eyes , it's painful to watch. But I know he is better for it. Even good people make mistakes. But he has his whole family's love and support to make sure he doesn't do anything like this again. My family begs you to consider his sentencing and to please be lenient towards him.
Thank you,

Diana Othman



Inline Cable Corp.
211 Arlington Avenue
Staten Island, N.Y. 10303

**June 4, 2020**

To Whom It May Concern:

I have known Mr. Hakmet Othman for close two and a half years. He has been the warehouse manager of the company's Staten Island warehouse. Inline Cable is Sprectrum's #1 Contractor in the New York City region and Mr. Othman has been a key member of the team that has helped us to reach that status.

He is responsible to make sure that the warehouse processes run smoothly and promptly. Mr. Othman is in charge of maintaining the warehouse in compliance with the company's policy and strategic vision. He has shown great commitment to helping our technicians succeed as he is the first one in at the warehouse and prepares all the equipment, materials and trucks for the day.

During the COVID 19 pandemic, he has been a total asset to maintain the health of our team and keep up with the safety, hygiene and security of our Staten Island location. He has spent countless hours looking for masks, gloves and hand sanitizers. He made sure that the staff was equipped with all the PPE necessary to access customers' homes safely.

At the end of April of this year, our construction crew was assigned to set up the coax feed for a temporary COVID 19 hospital in Seaview Ave in Staten Island. Mr. Othman was part of the team that helped to complete this assignment. He worked closely with the team bringing equipment and material back and forth to set up the hospital.

In addition to Mr. Othman's responsibilities, he took on other tasks that have been of a great benefit to the team and the company in general. He took upon himself to give maintenance to our fleet. This proved to be very valuable as it has saved us several thousand dollars in these very challenging times where we have been struggling financially due reduction of work.

In summary, I believe Mr. Othman is a great member of our team who goes the extra mile to make sure the company succeeds. He is a valuable individual, a family man and good father.

If you have any questions, please do not hesitate to contact me.

Luis Cevallos
**Vice President**
211 Arlington Avenue
Staten Island, NY 10303
917-604-0757
lcevallos@inlinecable.com



*TO: Dr. BARDAY... Sorry for the delag!*

**MEG S. KAPLAN, PH. D.**

210 EAST 68th St., #1-H
NEW YORK, NY 10065
TEL (212) 517-6624
FAX (212) 517-4073
e-mail msk2@cumc.columbia.edu

May 14th, 2018

Len H. Kamdang, Esq.
Assistant Federal Defender
Federal Defenders of New York, Inc.
East District of New York
One Pierrepont Plaza, 16th Floor
Brooklyn, New York 11201

By Federal Express; telephone is: 718-407-7414

Re:     Psychosexual and Risk Assessment of Mr. Hakmet Othman

Dear Mr. Kamdang:

        I have evaluated Mr. Othman, with my report below:

**Identifying Information and Reason for the Evaluation:** Mr. Othman is 43 years old.  His date of birth is 09/19/74.  He is married and lives with his wife, Dana.  He has been married for 24 years.  He has six children, five at home.  Their eldest girl was married recently.  He is a U.S. citizen.  His religion is Muslim, however; he is non-practicing.  His profession is that he works now in a cable company warehouse as a subcontractor.  He lives on Staten Island in a house that he owns.  He has lived there for 11 years. Mr. Othman was asked why he is seeing me.  He stated that he had been recently arrested for downloading and possessing child pornography.

**Sources of Information:** Included the following interviews:

        1.      I interviewed Mr. Othman for 4 hours on April 26th, 2018, in my office.

        It also included a review of the following materials, provided by your office:

        1.      The Complaint

        2.      The Indictment

        2.      Bates stamped documents as follows: HO000002-HO000010; JO000046-HO000066HO000040-HO0000-63; HO000065-HO000066; HO000069-HO000080

Othman, Hakmet                                                                    Page   2
May 14th, 2018

    4.    A series of images in pdf format identified by the numbers 000011-000045

**Informed Consent for the Examination:** Prior to the examination I informed Mr. Othman that I was performing an evaluation at the request of his defense attorney and that whatever he said to me could be included in a report to him, and that his defense attorney may, in turn, choose to present this to the Court and the prosecution.  I also presented information on the various psychological and written tests that I would be administering.  Mr. Othman understood this information and signed appropriate consent forms.

**Developmental History:** Mr. Othman stated that he was born in Jerusalem, Israel, and came to the United Stated at the age of 5 in 1979 with his family.  He stated that his mother, as far as he knew, had a normal birth.  He was raised in Brooklyn, New York, by his parents.  He is one of eight children.  He was in the middle.  He stated that growing up was okay and normal, but that his father was very physically abusive throughout his childhood, to his mother, himself, and his siblings.

**School:**  Mr. Othman stated that he went to PS169 for kindergarten, but had a language problem.  He stayed there one year and then was put into special education.  Then after one year, he went to PS176 and stayed there from 2nd grade through 6th grade also in special education.  When asked why he was in special education, he stated that he did not know.  In 7th and 8th grades, he went to IS88 also in Brooklyn, which was also special education.  He stated that he would get into a lot of fights and had a lot of problems in 7th and 8th grades.  When asked why, he stated that he was bullied.  He was the only white kid.  He was very quiet and he was an immigrant and he fought to defend himself.  For high school, he went to Telecommunication High School where he was again kicked out for fights.  Again, he stated that he was bullied and fought to defend himself.  He then went to the John J. High School in Park Slope, but quit that, and then went to Brooklyn Tech and then Nu-Trek and then quit school.  He stated that he was not a bad kid at all and that he was not a bully, but that he was defending himself against bullies and became angry and aggressive.  He stated that the last grade he attended in high school was the 10th or 11th grade.  He never finished high school.  After 11th grade, he stated that he started working in grocery stores in his neighborhood and also making deliveries for grocery stores.

**Military History:**  He stated that he had tried to enlist in the military, but he was denied since he had a prior felony.

**Social History:** Mr. Othman stated that he was married at age 18.  At that time, his wife was 14.  He stated that this was an arranged marriage that took place in a mosque.  He stated that at age 17 he was engaged to his now wife and at that time she was 13.  He stated that this was normal for his culture and society.  This was arranged by his parents.  He stated, "That is what you did."  When he got married, he was a virgin.  He stated that his wife looked older and his parents told him that she was older, but they lied to him.  He stated that they were both very inexperienced.  For example, on his wedding night he played videogames.  Mr. Othman stated that he had his first child before his first wedding anniversary.  He now has six children, ages 11 (twins) to age 23.  His eldest daughter recently married in September of 2017 with this also being an arranged marriage.  He stated that his wife did not work while his children were growing up, but now that his youngest twins were 11 she recently started substitute teaching for the Board of Education.

Othman, Hakmet                                                              Page   3
May 14th, 2018

**Sexual History:** Mr. Othman stated that he had had extramarital affairs from the beginning of his marriage mostly involving relationships. He stated that for the past five years he had had a relationship with a 45-year-old divorced woman named Maggie. He stated that he was in love only once at the age of 35 with a 20-year-old woman, but said that it did not work out.

**Family History:** Mr. Othman stated that his parents' marriage was intact. They live in Brooklyn with his brother. He stated that his father was in his 70s. He worked in supermarket businesses, but had made bad business decisions. Mr. Othman stated that when he was growing up his father was extremely violent. He beat his mother a lot and him and his siblings. He grew up being very afraid of his father, but when he got older he defended his mother. He stated that he last saw his father at his daughter's wedding. He said that he sees his father from time-to-time, but that they were not close. Regarding his mother, Mr. Othman stated that his mother was a really nice person, very lovable. She only had love in her heart and she helped people all of the time. He stated that when his father hit him and the kids, she would defend them and then he would beat her for defending them. He stated that when his father hit him and his siblings and his mother they had bruises. He would kick them, hit them with extension cords, punch them, smack them, and beat them. He stated that this was very brutal. It was as if two men would be in a fistfight. Mr. Othman stated that he was very different with his family and his wife. He was nonviolent.

Regarding his siblings, he stated that he had eight siblings. The oldest was Rowyda, a female, who was 49. She married at the age of 16 and had five children and lives in California. The next eldest is Huda, 47, who also married at 16. She has six children and lives in Staten Island. The next oldest is Sam, 45 a male, who is married, with six children and who lives in Brooklyn. He stated that Sam lives with his parents and another brother in a multifamily house. Next in line was Mr. Othman. Next was Assi, a male, age 42 who was very troubled and had a long history of drug and alcohol use and lives with his mother and brother. He was single and he had been through multiple rehabilitations. He stated that his mother takes care of him. He was the only sibling who had had a drug and alcohol history. The youngest child was Yusif, a male, 21, who also lives at home. He was a correctional officer. He stated that he was "a good boy." Because there was such large age difference he stated that Yusif used to call Mr. Othman dad.

**Mr. Othman's Children:** He stated that all of his children were very smart and that they were all good kids. The eldest is Amina, who married recently. She is 22 and graduated college. Next was Rowyada, 21, who lives at home. She is currently in Baruch College and working part-time as an analyst in a bank. Next in line was Nadia who is 19, also in school and works in a tax firm. Next is Mohammad, his son, 15, who is in high school. Finally there are his twins, Medina and Mecca, who are 11.

**Support:** Mr. Othman stated that he had a lot of people supporting him although he had not told a lot of people about his arrest. He stated that his mother was very supportive, as was his sister and his girlfriend, Maggie, who also loves and supports him. He stated that his current boss was one of his best friends and when he lost his job because he was arrested at his job, his friend gave him the job that he has now.

Othman, Hakmet                                                                    Page    4
May 14th, 2018

**Index Crime:** Mr. Othman stated that the police raided his home, traumatized his wife and children, and then came to his job and he was questioned.  He stated that he told them the truth. He stated that he was an assistant manager in a chain supermarket, but lost his job, but his friend gave him a job after that.  He stated that he was on house arrest.  He wears an ankle monitor and he is allowed to go back and forth to his job.  He stated that when the FBI came in, they questioned his children and looked at all their computers.  They had an IP address, but not his name.  They traumatized his children.  He stated that they asked his son, 15, if he had ever looked at child pornography.  He said that his son did not even know what they were talking about.

**Pornography Use:** Mr. Othman stated that his pornography use started at the age of 11 or 12 at his friend's house.  His friend had VHS tapes and they both would cut school and after school would look at these pornography tapes.  He stated that at age 14, his father caught him because he had a tape that was stuck in the VHS machine.  From 15 on, he would look at pornography and go to 42nd Street and look at pornography in booths.  He stated that his pornography was not a problem for him or in his life until approximately three years ago.  He stated that he was on the computer and there were pictures of young girls, 14 or 15, in lingerie.  He would look at these pictures of these girls clothed.  These were legal pictures that were all over the web.  He stated that one day he was downloading those pictures and Torrents popped up with the message "preteen and teen."  He stated regarding Torrents, that some of them have 2000 or 5000 pictures and videos.

Mr. Othman stated that he was not sexually aroused by any nudity from adult women or from older teenagers.  He did not like to view nakedness.  He stated that it turned him off.  He stated that he was "a lingerie and panty guy" in porn and in real life.

Mr. Othman stated that he would watch a hundred videos until he would find the one that he wanted, which would be the person in the sexiest underwear, and that they were from age 14 or 15 to adult older women.  He stated that if he found videos or pictures he would just go through them to find what he wanted.  He stated that what was arousing to him was a woman being in underwear; he experienced this as though they were teasing him.

Regarding pornography, Mr. Othman stated that once he started to look at underage pornography, he would beat himself up about this.  He stated that he hated himself.  He stated that he knew that it was wrong.  He did not know why it got to this point.  He stated that it was a relief when he got arrested and he wished that this had happened before.  His wife would say to him "you just look at the computer."  He stated that he would eat dinner looking at the screen.  His computer was everything to him.  He stated that at night, he would look at porn after everyone went to bed.  He stated that he would delete everything and say, "I am done" but three to six months later, he would start again.  He hated himself for it.  He knew that it was not good since these girls were obviously victims.

**Medical History:** Mr. Othman had no history of medical problems.  The only medication that he takes was Advil for sinus headaches.  He stated that he went to his regular doctor the day before my interview of him and told his doctor that his head hurts and that he felt pressure in his head.  He said that his doctor told him to go to the psychiatric emergency room, which he did yesterday, at

Othman, Hakmet                                                    Page    5
May 14th, 2018

Richmond University.  He stated that they told him that he needed to exercise and that they would treat him.  They told him to come back in five days for an appointment and he assured me that he would.

**Past Mental Health History:** Mr. Othman had no psychiatric history.

**Substance Abuse History:** He stated that he had no substance abuse problems or drinking problem.

**Head Injury History:** He stated that he has never had a head injury.

**Criminal History:** Mr. Othman stated that at the age of 19, he was arrested for fighting, coming out of a club.  He pled guilty to battery, which was a felony.  Because it was his first arrest, he received five days community service.  He also stated that last year, in 2017, his wife was getting a ticket for making a left turn in her car at a no-turn zone and he was standing across the street and he saw it and got very angry.  He said that the policeman that was giving his wife a ticket arrested him for obstruction of justice, but this was dismissed.

**Childhood Sexual Abuse:** Mr. Othman was asked if he was ever abused as a child.  He got very quiet and had great difficulty talking about this.  He stated that in his late 20s, he started to have glimpses of something that happened to him when he was a child and slowly he started to remember that when he was 6 he remembered a guy driving and he was standing with some other children and this man stopped and asked them if they wanted candy.  He stated that the man first asked a friend of his and the friend said no and he said to his friend why don't you want candy and he jumped into the car.  This man drove him somewhere and parked the car and said stick out your tongue, which he did and the man put his mouth in his mouth and said tell me that you like it, which he complied with.  He stated that this was very difficult to talk about and he did not either remember details or did not want to go into details about what happened.  He did, however, state that he remembered his pants being down.  This was very upsetting to Mr. Othman and I did not pursue details.  He stated that the man drove him back to where his friends were.  He stated that he had never told anybody about this and did not really think about this until he was in his 20s.  He thinks about this now often and gets very angry both at the man, his parents, and himself.  He wondered where were his parents, why did not they tell him not to get into cars with strangers or accept candy from strangers.  He felt that he was angry at himself since he was stupid to go with the man and he blames himself.  He stated that all of this angers him.  Mr. Othman stated that he wanted to slap himself on his head.  He stated this was the first time that he had ever discussed this.

Regarding his attraction to children, Mr. Othman stated that he would never hurt anyone.  He had never been attracted to children or teenagers in life nor would he ever want to have sex with a child or teenager.  He stated that this was about him and his computer.  He stated that he had fantasies involving older teenagers and adults.  Again, Mr. Othman stated that he liked sexy panties.  He did not like thongs and did not like nudity, which turned him off. Regarding age, he stated that he liked women that were mature.  He liked underwear that was more of a tease.  He

Othman, Hakmet                                                                    Page   6
May 14th, 2018

stated that on the computer, he clicked to see what it was in terms of child pornography and moved on until he found older teenagers or adult women in sexy underwear.

**Non-Deviant Sexual History:** Mr. Othman stated that he reached puberty at the age of 13.  His first ejaculation occurred at the age of 13 by masturbation.  His first crush was at the age of 16 with a peer age girl at work who was Italian.  He stated that he worked in an Italian neighborhood.  His first non-genital touching, or petting was at the age of 14 with an adult female whom he delivered groceries to.  His first genital experience was at the age of 16 with the same Italian girl that lived in the neighborhood.  He had had one orgasm in the week before my interview of him by means of sexual intercourse with his wife.  The most orgasms he had had by any means in a week in his life was 7.  Mr. Othman stated he had had 20 female sexual partners and no male sexual partners. His sexual orientation was heterosexual.  He stated that the masturbatory fantasies he had had the past 10 times he had masturbated involved pornography videos that had stories in them rather than just sex, European videos of porn that were like watching a movie with adults.  He stated that he was only aroused by women in underwear, not thongs, and that he always had sex with women while they were wearing underwear, never when they were nude.  He said that he would move their underwear aside when he wanted to insert his penis. Nude women turned him off.

**History of Sexual Dysfunction**: Mr. Othman said that he had never had trouble functioning sexually.

**Paraphilic and Hypersexual History**: Mr. Othman stated that he had never engaged in fantasies, urges, or acts involving exhibitionism, fetishism, frotteurism, sexual masochism, sexual sadism, transvestic fetishism, voyeurism, biastophilia, excessive masturbation, telephone sex, internet sex, or any gender identify problems.  He stated that he had had trouble with pornography over the last three years.  He said that he had had difficulty staying away from images of older teenage females.  He indicated on the self-report scale of sexual interest over the last week that he had had sexual thoughts very infrequently or not at all.  In the past seven days, he had not masturbated.  He had had sex one time with his wife during the past week.  He had never had any nocturnal emissions.

**Psychological Testing:** Included the following psychological tests with results as noted:

**Tests to Assess Deviant and Non-Deviant Sexual Behavior:**

1.    **The Bancroft Self Report Scale of Sexual Interest and Activity (Developed by Bancroft, Tennent, Loucas, & Case, 1974):** was administered, with Mr. Othman being asked to score it with two points of time in mind.  The first was before his arrest.  The second was for the week before my interview of him.  There are two components to this scale.  The first is the Frequency of Sexual Thoughts Scale.  This scale asks Mr. Othman to indicate how often he finds himself thinking sexy thoughts on a scale of 0, or no sexual thoughts at all, to 5, or sexual thoughts frequent and usually associated with feelings of sexual excitement in previous week.  Mr. Othman reported a 2 out of 5 for the first point in time before his arrest and a 1 out of 5 in the week before my interview of him.  The second part asks how many ejaculations Mr. Othman had had in the week prior to the interview.  Mr. Othman reported that he had

Othman, Hakmet                                              Page   7
May 14th, 2018

had 2 ejaculations in a week period during the period before his arrest and only 1 ejaculation in the week before I interviewed him.  Both of these scores suggest a reduction in sexual interest and behavior from the period of time before his arrest to the period just before my interview of him.

2.   **The Clinical Global Impression Scale (Developed by Guy, 1976):** was scored, with Mr. Othman receiving a score of 3, or mildly ill.  This scale is a rating scale, which was developed at the National Institute of Mental Health for having clinicians rate how ill a patient is compared with the universe of patients that this clinician has seen with the sort of disorders that are in question.  This scale ranges from 0, not assessed, or 1, normal, not at all ill, to 7, among the most extremely ill patients. Further, this scale has been used to estimate the degree of severity for a substantial number of disorders, ranging from schizophrenia, to eating disorders, to obsessive-compulsive disorder.  In this case the focus of my estimation involved sexual and paraphilic disorders.  In this case, I rated Mr. Othman as being a 3, or mildly ill, compared with the thousand plus individuals with paraphilias and/or sexual disorders that I have evaluated.

3.   **The Bumby M Scale:** which is a presentation of 38 cognitions which pedophiles use to support their deviant behavior was administered.  Mr. Othman endorsed none of these items in the deviant direction, suggesting that he does not make use of such cognitions.

4.   **The Derogatis Interview for Sexual Function (Male Version):** was administered. This is a validated and normed instrument that makes enquiries about an individual's sexual behavior in a variety of domains for the time period of the 30 days prior to the administration of the test, including sexual cognition/fantasy; sexual arousal; sexual behavior/experiences; orgasms; and drive/relationship.  Mr. Othman's scores were in the 30th percentile for cognition/fantasy; 60th percentile for arousal; 5th percentile for sexual behavior/experience; 93rd percentile for orgasm; and 48th percentile for sexual drive/relationship.  Mr. Othman was in the 38th percentile for men for overall sexual activity and functioning.

5.   **The Coleman Compulsive Sexual Behavior Inventory:** this is an inventory that focuses, among other things, on the inability to control sexual impulses.  It has been described and validated in peer-reviewed literature.  One scale of this instrument, the Control Scale, was used.  This presents 13 items that an individual is asked to rate from 1, very frequent use, to 5, never engaged in.  A higher score reflects greater control over sexual impulses.  Pedophiles have a mean score of 36.2, sexual compulsives a mean of 31.7, and controls a mean of 57.2.  Mr. Othman was asked to complete this with two points of time in mind; the first was during the period before he was arrested and the second was for the week before I interviewed him.  He received a score of 36 during for the first period of time and 65 during this second.  The scores suggest that Mr. Othman's sexual behavior was compulsive and that his degree of control had increased substantially since his arrest.

Othman, Hakmet                                                                Page   8
May 14th, 2018

6.     **The Kinsey Scale:** which is a scale developed by Kinsey which asks an individual to endorse a number from 0, indicating they were exclusively heterosexual to 6, indicating that they were exclusively homosexual.  Mr. Othman circled a 0 indicating that he was exclusively heterosexual.

**Tests to Screen for Other Psychiatric Syndromes:**

7.     **A SCID-I, or Structured Clinical Interview for DSM-IV and DSM-IV-TR Axis I Disorders:**  which is a validated structured diagnostic instrument for the establishment of Axis I DSM-IV-TR psychiatric disorders.  Mr. Othman met criteria for major depression, single episode, and post-traumatic stress disorder, chronic.

8.     **The Beck Depression Inventory:** which is an instrument that is used to assess the degree of depressive symptomology that an individual has; the higher the score the more depressed an individual is.  The maximum score is 63. Mr. Othman had a score of 30, which is significantly elevated suggesting that he is substantially depressed currently.

9.     **A Mini-Mental Status Examination:** which is a well-accepted screen for cognitive disorders.  Mr. Othman received a score of 28 out of 30, suggesting no organic problems.

10.    **The Washton Alcohol and Drug Use Questionnaire:** which is a brief questionnaire which asks an individual to indicate if he or she had used drugs or alcohol, what the time frame of his use was, when he or she had last used any substances, and if substance use had ever been a problem.  Mr. Othman indicated he had never used drugs or alcohol.

11.    **The Drug Abuse Screening Test (DAST):** which is a 28 item validated screen for substance abuse.  A score of less than 5 is normal.  Mr. Othman received a score of 2, suggesting that he was not a substance abuser.

12.    **The Adverse Childhood Experiences Scale:** which is a scale developed by Kaiser-Permante and the National Institute of Health to quantify the degree of adverse childhood experiences and individual has experienced.  It presents 10 questions, such as "did an adult or person at least 5 years older than you ever touch or fondle you?"  This instrument has been validated and it has been demonstrated that the greater the score the more likely the occurrence of adverse physical or mental health consequences.  Mr. Othman had a score of 5, which is a relatively high score, documenting significant childhood adversity.

**Risk Assessment Instruments:**

Othman, Hakmet                                                                    Page    9
May 14th, 2018

13.    **The Child Pornography Offender Risk Tool (CPORT):** this is an instrument
developed in Canada, which has been validated.  It relies on scoring a number of
demographic factors and aspects of the offending behavior; it results in a score of 0
to 7, the higher the score the greater the risk.  Mr. Othman had a score of 1, placing
him in the low risk group for sexual re-offense, involving either child pornography,
contact sexual crimes, or both.

14.    **The Sexual Violence Risk-20:** which is an instrument to guide structured
assessment of consideration and rating of a number of risk factors and other factors
which would be relevant to the risk of sexual violence that an individual presents.  I
rated Mr. Othman as having only 1 of 20 factors present.  I would overall rate Mr.
Othman's risk of sexual violence (i.e. sexual aggression towards an actual person)
using this instrument as low.

15.    **The SONAR:** which is an instrument developed by Hanson et al which attempts to
incorporate dynamic factors into an individual's risk assessment.  I computed Mr.
Othman's score as being 1 (on a scale which extends from the lowest score of -4 to
the highest score of 14).  This falls within the low risk category (-4 to 3)

**Mental Status Examination:** Mr. Othman presented as dressed neatly in jeans and a Spectrum
shirt from work.  He stated that his mood was a little anxious, except when he was talking about
being physically abused and about his childhood sexual abuse when he became visibly upset.
There was no indication of psychosis or thought disorder.  He denied suicidal and homicidal
ideation and intent.  Mr. Othman had good insight, good impulse control and good judgment and
was very open about his use of pornography and child pornography.

**Impression:** Mr. Othman has been married for 24 years.  He has six children and is employed full
time.  He also has a long time girlfriend, 45, and has had long-term relationship alongside with his
arranged marriage.  He stated that he has viewed adult pornography for over 20 years, but
approximately three years ago, for some reason, and he does not know why, he began
downloading child and teenage pornography.  He stated that he would delete it.  He would vow not
to download it again.  He was upset with himself, but was unable to stay away from it.

There are several factors that may have contributed to Mr. Othman viewing of child
pornography.  One is cultural and familial.  He was engaged at the age of 17 to a 13-year-old
female in an arranged marriage.  He was married at the age of 18 to a 14-year-old female.  This
was the typical practice for him and his siblings in his family and in his culture.  He also has a
history of childhood sexual abuse, which he has not had treatment for and a history of extensive
childhood physical and emotional abuse imposed directly on him.  He also witnessed his mother
and his siblings being physically abused.

Mr. Othman stated that he was not aroused by prepubertal children, but was aroused by
older female teenagers and mature adult females.  He was not aroused by nudity, but rather by
females in sexy underwear who he experienced as "teasing."  He stated that he had never had
sexual arousal or interest in any children including his own.  There is no indication that he is at any

Othman, Hakmet                                                                    Page    10
May 14th, 2018

risk to his children or to any other children in the community.  He also has a history of using
pornography in a compulsive and dysfunctional way that interfered with his life.  The CPORT, an
instrument developed specifically to assess risk of re-offense for an individual arrested for child
pornography places him at low risk.

**Diagnoses (According to DSM-5):**

1.    Major Depressive Disorder, Single Episode

2.    Posttraumatic Stress Disorder, Chronic

**Opinion:** It is my opinion that Mr. Othman is at low risk to commit another sexual offense in the
community and that he could easily and safely be treated in the community under the usual
conditions of supervision by federal probation.  Further, research has demonstrated that neither
incarceration per se nor the length of incarceration is related to the risk of recidivism (see
appended article by Nunez et al.).  Finally, incarceration of Mr. Othman, who is the main
breadwinner for his family, would have a negative impact on his family, both financially and
emotionally.

Please do not hesitate to contact me if you have any further questions.

I have included a copy of my resume for your information.

Sincerely,


Meg S. Kaplan, Ph.D.





FIFTH AVENUE
FORENSICS

Alexander Sasha Bardey, M.D., PLLC
Kate Termini, Psy.D.

## FORENSIC-PSYCHIATRIC EVALUATION

### HAKMET OTHMAN
**Indictment Nos.: 18-CR-98**

**April 19, 2019**

Leo Duval, Esq.
885 Annadale Road
Staten Island, NY 10312

Dear Mr. Duval,

At your request, I performed a psychiatric and psychosexual evaluation of your client, Hakmet Othman, a 44-year-old man currently charged with possession and receipt of child pornography. The purpose of this examination is to gain a better understanding of his mental state at the time of the instant offense and to assist the court in gaining a clearer understanding of any underlying psychological and/or psychiatric factors directly related to the offense. The examination took place in my office located in Manhattan, New York on January 25, 2019.

During my evaluations, I reviewed Mr. Othman's personal, social, educational, vocational, and psychiatric histories. I also assessed his understanding of the circumstances that led to his arrest. I performed a mental status examination in order to assess his intelligence, thought processes, cognitive functioning, memory, credibility, orientation, judgment, insight, and impulse control. Mr. Othman understood the limits of confidentiality inherent to such an evaluation.

The *Personality Assessment Inventory (PAI)*, a psycho-diagnostic test, was administered on January 29, 2019 to help shed light into his enduring personality traits, as well as his current emotional functioning. The *Abel Assessment for Sexual Interest-3* (AASI-3), a psychosexual assessment instrument, was also administered. In addition, the *Bumby Cognitive Distortions Scale* and the *Adverse Childhood Experience* (ACE) Questionnaire, both self-report measures, were administered as well.

I reviewed the following collateral sources of information:

1. Indictment, the United States of America v. Hakmet Othman, dated February 22, 2018
2. Complaint, the United States of America v. Hakmet Othman, dated January 30, 2018
3. Interview Report, Federal Bureau of Investigation, dated February 20, 2018
4. Federal Defenders of New York, Defense Discovery Packet, authored by Len H. Kamdang and Elba Torres-Perez, dated July 5, 2018
5. Psychosexual and Risk Assessment Report, authored by Meg S. Kaplan, PhD, dated May 14, 2018
6. Written Statements, authored by Deena Othman, Amena Othman, Rowyda Othman, Nadia Othman, Mohammed Othman, Mecca Othman, Subhi Othman, Diana Othman, & Medina Othman
7. Character Reference Letter, authored by Luis Cevallos, Vice President of Inline Cable Corp., dated May 8, 2018
8. NYS Division of Criminal Justice Services, Criminal Record – Hakmet Othman
9. Affidavit in Support if Application for a Search Warrant, dated January 29, 2018
10. Treatment Records, Richmond University Medical Center, dated April 25. 2018

I conducted the following collateral interviews via phone for the purpose of obtaining information useful in my assessment:

1. Ms. Deena Othman (wife)
2. Ms. Amena Othman (oldest daughter)
3. Ms. Rowyda Othman (daughter)
4. Ms. Nadya Othman (daughter)
5. Mr. Larry Menzie, LCSW-R, Mr. Othman's treatment provider at Queens Counseling for Change

## PAST PERSONAL HISTORY

Mr. Hekmet Othman is a 44-year-old, Caucasian male of Palestinian decent, born on September 19, 1974 to the marital union of Adnan and Rabeeha Othman, in Jerusalem, Israel. He was raised in Jerusalem until age five, at which time his family immigrated to America and settled in Brooklyn, NY. Mr. Othman's mother, Rabeeha Othman, is "in her 60s" and currently resides in Brooklyn, NY. His father, Adnan Othman, is 72 years old, was previously employed in a grocery store, and is currently being treated at a "rehab facility" in Brooklyn, NY, subsequent to being struck by a taxicab. Mr. Othman reported that he is Muslim, however, he was raised non-observant, in a "modern Muslim family." Mr. Othman is the fourth of eight children born to his parents—firstborn Rowyda Othman (50 years old), Huda Othman (48 years old), Isam Othman (46 years old), Assi Othman (approximately 40 years old), Howyda Othman (38 years old), Mohammed Othman (34 years old), and Yousef Othman (22 years old). Mr. Othman denied a family history of mental illness in the present evaluation; however, in a collateral interview I conducted with Mr. Othman's wife, Ms. Deena Othman, she reported that "all of his [Mr. Othman's] siblings" are currently

prescribed medication to treat depression. Mr. Othman reported that his brother, Assi, is "troubled" and struggles with "a drug problem." Mr. Othman's father, a "tough guy" with "a temper," was reportedly verbally and physically abusive toward him, his mother, and his siblings. According to Mr. Othman, all of his siblings moved out of their parents home because they "didn't want to live with [his] father." Mr. Othman reported that he forgives his father for the abuse he inflicted upon him, his mother, and his siblings; he stated, "You have to."

Mr. Othman is currently married to Ms. Deena Othman, who is 39 years old and is employed by the Board of Education as a substitute teacher for children with special needs. The two were married in an arrangement made by their parents when Mr. Othman was 19 years old and Ms. Othman was 14 years old; the arrangement had been made one year prior. Mr. Othman has six children from his marital union: Ameana (23 years old), is married with one child and currently resides in Staten Island with her husband and child, Rowyda (22 years old), Nadya (20 years old), Mohammed (16 years old), and Mecca and Medina (11-year-old fraternal twins) currently reside in Mr. Othman's home in Staten Island, NY.

Mr. Othman was unaware of any problems with his mother's labor or delivery of him. He denied experiencing any developmental delays of any kind. He was educated in the Brooklyn public school system. He attended PS 169 for kindergarten and first grade—he reportedly failed and had to repeat first grade; he indicated that he struggled to learn English at first. Mr. Othman subsequently transferred to PS 176 for second grade through sixth grade, during which he was placed in special education classes, reportedly due to behavioral problems.

Mr. Othman disclosed that a stranger sexually abused him when he was seven years old. He reported that he was playing at a park with "a bunch of kids," when a man approached him and offered him candy, at which time Mr. Othman reportedly followed the man to his vehicle and got inside. The man reportedly told Mr. Othman to "duck down," and then he "drove under the overpass" and parked his car. Mr. Othman stated, "I know something happened to me." He reported that he could not remember all of the details of the event, however, he "remembers that [his] pants were down" and the man "made [him] stick [his] tongue out and say 'I like it'." The man eventually "kicked [Mr. Othman] out of the car," at which time he went home and told his mother, "Something's wrong with my butt," to which she responded, "Stop being fresh." Mr. Othman reported that he did not disclose the abuse to anyone prior to his arrest for the instant offense. He stated, "I never told anyone because it makes you less of a man. How did I let that happen?" He added, "It was hard telling my wife that, I'm supposed to be like superman."

Mr. Othman reported an extensive history of physical altercations with peers throughout his years in school, subsequent to being sexually assaulted. He reported that while in elementary school he was "suspended all the time for fights." He reported that he was "kicked off the bus" in third grade due to "kicking the windows out." He stated, "I wasn't a trouble maker, I was over defensive." Mr. Othman attended Dyker Heights

*Forensic-Psychiatric Report*
*Hakmet Othman*

Intermediate School 201 for seventh and eighth grades, reportedly in special education classes for behavioral problems. He reported that he was "suspended a lot in middle school" for "fighting." Mr. Othman attended the High School of Telecommunication Arts and Technology in Bay Ridge, Brooklyn from ninth grade until halfway through tenth grade, at which time he was expelled because he reportedly "exploded one day"; he reported that he got into a physical altercation with a peer, during which Mr. Othman "picked up a table and slammed it on his back…went to the principal's office, but kept running back out of the office to find the kid until the cops came." Mr. Othman reported that he subsequently attended John Jay High School for one day in tenth grade but transferred again immediately thereafter due to fighting; he stated, "It was bad…I told myself 'I'm not gonna survive this'." He enrolled at Brooklyn Technical High School thereafter, where he attended classes for "two or three weeks," however, he "got into so many fights [he] couldn't stay there." Mr. Othman reportedly attended New Utrecht High School briefly thereafter, however, he left after a few days because "kids were smoking in the classrooms" and he "did not want to be there." He stated, "I hated everyone. I couldn't stay in school." and subsequently worked in multiple supermarkets until his arrest for the instant offense. Mr. Othman dropped out of high school at age 16. He reported that his father said to him, "Go to work, f*ck school."

Mr. Othman denied a history of drug and alcohol abuse—"Never." He has never participated in substance abuse treatment.

Mr. Othman was arrested for the first time in 1995 at age 20 for assaulting an auxiliary officer while playing baseball, for which he received a conditional discharge. He was arrested a second time in 2017 for petit larceny, for "accidentally stealing shopping carts" from a nearby supermarket, which he reportedly thought belonged to the supermarket where he was employed; the charges were dismissed. Mr. Othman has had no additional criminal justice involvement preceding the instant offense.[1]

Mr. Othman did not receive mental health treatment of any kind prior to his arrest for the instant offense. Per his reported history, he exhibited symptoms in childhood and adolescence that are indicative of a trauma response. His aggression and uncontrolled rage caused him to continuously get into fights throughout his schooling, which eventually prompted him to drop out of school. Since that time, Mr. Othman reported that he "was just angry all the time," and continued to get into fights with other men during early adulthood. He endorsed recurrent memories of being sexually assaulted; he reported, "I always thought about ways to get it out of my head…I'd say to myself, *'think of something else, think of something else'*." He further reported that due to his assault, he has "trust problems…I don't trust anyone," and he is "overprotective" with his children, such that he "gets paranoid" and does not like when they go out on their own; he stated, "I always tell my wife, *'Somebody could take the kids'*."

---

[1] NYS Division of Criminal Justice Services, Criminal Record – Hakmet Othman

*Forensic-Psychiatric Report*
*Hakmet Othman*

## SEXUAL HISTORY PRECEDING THE INSTANT OFFENSE

Consistent with early exposure to sexual abuse, Mr. Othman reported, he first became interested in sex at an early age, approximately 11, at which time he began watching pornographic videos at a friend's house. Mr. Othman reportedly began masturbating at that time as well, in his own private company. Mr. Othman reported that at age 16, he had sexual intercourse one time with a girl who was his age, which was his first sexual experience. He reported that he "likes lingerie, not nakedness," such that he has never had sexual relations with a woman who is fully nude; they "always leave underwear on." Mr. Othman reported that while watching pornography, "If I see nakedness, I stop watching." He stated, "I have always watched [pornographic] videos." He reported that he "never stopped" doing so from the time he started until his arrest for the instant offense. He reportedly preferred to watch "classic porn, story-line porn, and European porn." He reported that he "look[s] at a million videos before [he] start[s] to masturbate."

Mr. Othman reported that he has "a high sex drive" and has had "about a dozen" extramarital affairs. He reported that because he married at age 19, when his friends (who were his age) began going to nightclubs, he was already married; however, he wanted to be with his friends so he accompanied them, during which time he met and engaged in affairs with multiple women. He stated, "I never knew what marriage was…I never understood it…I caught myself later on." He reported that at age 34 he "dated" a 20-year-old woman who "brought [his] youth back." Mr. Othman reported that although he had multiple affairs, "I never chose anyone over my family." He reported that he does not want "to throw it in [his] wife's face anymore." He stated, "I do hate myself about that…I never wanted her [his wife] in pain."

## THE INSTANT OFFENSE

Mr. Othman stated, "One minute you're looking at porn, the next minute you're looking at younger girls. That's how I got myself into this." He reported that approximately three years ago, while watching pornography featuring women of legal age, an image of a "young girl in a bikini popped up," so "[he] clicked on it." He "found out she was younger," however, he felt sexually aroused by the image and subsequently began looking at images of "pre-teen legal models," which he explained were images of pre-teens wearing lingerie, labeled as "legal," "because they have clothes on." Mr. Othman reported that soon thereafter he "learned that [he] could download model pictures," and began downloading images of pre-teen girls in lingerie. He reported that often when he clicked to download an image, numerous images and videos would download at the same time some of which depicted young girls "doing things to themselves or other men." He reported that the girls were "wearing adult stuff." He reportedly began looking girls who were approximately 13 years old, then started at looking at images of girls younger than 13 years old, approximately ten years old—"but they were doing adult things and wearing adult things." He stated, "At one point you start to like what you're looking at…before the computer it never came to my

mind. I could never walk down the street and see a kid like that." Mr. Othman reported that when he would attempt to download an image or video, thousands of other images and videos would download with it, simultaneously.

Mr. Othman reported that he has never harmed a child. He denied looking at images of young boys. He denied looking at images of girls under the age of ten. He denied identifying with the girls in the videos or the men who were involved; he stated, "I was just watching, not wanting to be there. I didn't identify with the guys in the videos." He reported that he has never fantasized while masturbating, stating that he "has to watch porn" while masturbating. Mr. Othman denied ever talking to, chatting with, or emailing underage girls or other viewers of child pornography. He denied being sexually attracted to young girls in real life, outside of the context of viewing images of them wearing lingerie. Mr. Othman stated, "In real life, I have never gone out and got aroused by a young girl." He further stated, "It wasn't okay. I hated myself for watching…I thought, 'You're disgusting'…I used to beat myself up for watching. I tried to stop every single time, but I couldn't." Mr. Othman reported that he last looked at pornographic images "before [his] house was raided." When questioned if he still has the urge to look at images of young girls, he stated, "I don't want to do it…it has destroyed my life."

According to the indictment, between approximately November 2017 and January 2018, Mr. Othman was allegedly in receipt and possession of child pornography, "the production of such visual depictions having involved the use of one or more minors engaging in sexually explicit conduct."[2]

## MENTAL HEALTH TREATMENT SUBSEQUENT TO THE INSTANT OFFENSE

Mr. Othman visited the Richmond University Medical Center Comprehensive Psychiatric Emergency Program (CPEP) on April 25, 2018, at which time he endorsed suicidal ideation, anxiety, and "intrusive thoughts" due to "recent stressors."[3] He was diagnosed with adjustment disorder with emotional disturbance and referred for follow-up treatment.[4]

Subsequent to Mr. Othman's arrest for the instant offense, he has been participating in a group treatment program at Queens Counseling for Change, once per week, on a regular basis. I conducted a collateral interview with Larry Menzie, LCSW-R, Mr. Othman's treatment provider at Queens Counseling for Change, on Friday, March 22, 2019. The details of the interview are described in the subsequent section of this report.

---

[2] Indictment, the United States of America v. Hakmet Othman, dated February 22, 2018
[3] Treatment Records, Richmond University Medical Center, dated April 25, 2018, p 1
[4] Treatment Records, Richmond University Medical Center, dated April 25, 2018

*Forensic-Psychiatric Report*
*Hakmet Othman*

## COLLATERAL INTERVIEWS

### Ms. Deena Othman

I conducted a collateral interview with Ms. Deena Othman on February 8, 2019 to gain a clearer understanding of Mr. Othman's personality, family history, and the psychological underpinnings of his behavior. The interview took place at my office located in Manhattan, New York.

Ms. Othman reported that she and Mr. Othman have been married for 25 years, since she was 14 years old. She stated, "My parents told me to do it, so I did it." She indicated that Mr. Othman's "infidelity problem" has "placed a strain" on their marriage throughout the years. She reported that for a long time Mr. Othman "thought it [infidelity] was okay," however, since beginning treatment, he has "apologized" to Ms. Othman for his infidelity.

Ms. Othman corroborated that Mr. Othman's father was abusive during his childhood. She described his parents as "traditional" and "not an affectionate family." She stated, "His parents didn't tell them right from wrong…they only cared that the kids were making money." She reported that from 1999 until 2006, she and Mr. Othman lived on one floor of a three family home with their children; Mr. Othman's parents and younger brothers lived on a different floor, and Ms. Othman's sister and Mr. Othman's brother, who are married, lived on the other floor. She and Mr. Othman reportedly bought a house in Staten Island, NY 12 years ago, where they currently reside with their five youngest children (their oldest daughter lives in a separate residence in Staten Island with her husband and child). Ms. Othman corroborated that Mr. Othman's father was recently involved in an accident, for which he is currently being treated at a rehab facility.

Ms. Othman reported, "From the beginning, since the birth of [their] first daughter, we said 'their lives won't be like our lives'." She reported that in their culture, "some fathers don't let their daughters go to school," however, Mr. Othman "always encouraged them to go to school." Ms. Othman reported that out of eight children, "only one of his [Mr. Othman's] brothers went to college," Yousef (age 22); he was reportedly taken in and raised by Mr. and Ms. Othman at a young age. Ms. Othman stated that Mr. Othman has been "around children his whole life," as they have approximately 45 nieces and nephews between the two of them, all of whom currently remain "in their life." She reported that one of their nieces who lived in California was struggling with depression "a few years ago," at which time Mr. Othman "flew out, brought her back, and took her in with us." She reported that their niece lived with them for a year and a half.

Ms. Othman reported that her husband has never physically, emotionally, or sexually abused a child. She reported that even after the FBI came to their home and she was made aware of Mr. Othman's charges, the possibility that he sexually abused her children or any other child "never even crossed [her] mind." She reported that Mr. Othman has never been

*Forensic-Psychiatric Report*
*Hakmet Othman*

physically, verbally, or sexually abusive toward her. She stated, "We never argue in front of our children."

Ms. Othman reported that Mr. Othman has been viewing pornography "since [she] met him." She reported that prior to his arrest for the instant offense, she noticed he was viewing pornography "two or three times per week"; however, she has never seen the specific content that he was viewing. She reported that Mr. Othman disclosed to her that he "went to watch peep shows, alone" when he was approximately ten years old.

Ms. Othman reported that her husband "never expressed his feelings." She corroborated that Mr. Othman's father was physically abusive toward Mr. Othman, his mother, and his siblings. She was reportedly unaware of the sexual abuse Mr. Othman endured during his childhood until she read a psychosexual evaluation report written subsequent to his arrest for the instant offense, wherein Mr. Othman's history of sexual abuse is mentioned; she spoke with him about the incident thereafter.

Ms. Othman reported that Mr. Othman suffers from sleep disturbance, in addition to being observably anxious and depressed. She reported that "all of his siblings take antidepressants...his doctor has told him that he needs antidepressants," however, he reportedly refused to take them, stating, "I can control it myself." Ms. Othman reported that Mr. Othman often "fights with himself," as he also reported to this examiner, such that he angrily talks to himself, "as if he is having an argument with himself...but no one can hear what he is saying." She stated, "He physically moves his hands as if he is fighting someone but no one is there." Ms. Othman reported that during her conversation with Mr. Othman regarding the sexual abuse he endured in childhood he replied, "Why do you think I'm always fighting with myself?" Ms. Othman reported that since he began mental health treatment subsequent to the instant offense, Mr. Othman has been "more open to talk about it when he is frustrated."

## Ms. Amena Othman

I conducted a collateral telephone interview with Ms. Amena Othman, Mr. Othman's oldest daughter, on Thursday, March 14, 2019 to gain a sense of Mr. Othman's role as a father and caretaker. Amena is 23 years old and moved out of her parents home two years ago; she currently resides in Staten Island, NY with her husband and six-month-old daughter.

Ms. Othman reported that her father is a "great father...stereotypical loving, energetic, fun parent," who was "always playing games with us, always around." She recalled instances when their family resided in Brooklyn prior to buying a home in Staten Island, at which time Mr. Othman would take her and her siblings to the park, to the bay to look at the water, and would race them down hills. Ms. Othman reported that her father "worked a lot" while saving to buy a home. She further reported that her parents had a "loving relationship"; she stated, "It was good in our eyes."

Regarding Mr. Othman's charges for the instant offense, Amena reported, "All of this was a huge surprise to all of us. He never did wrong to any of us. He was a good father and husband." Amena corroborated that Mr. Othman raised his youngest brother as his own son and temporarily raised their cousin from California while she was struggling at home.

## Ms. Rowyda Othman

I conducted a collateral telephone interview with Ms. Rowyda Othman on March 20, 2019. Rowyda, Mr. Othman's second born daughter, is 22 years old and currently resides in Staten Island, NY in her parents' home. She currently attends Columbia University, where she studies data analysis and programing. She recently graduated with a Bachelor's degree from Baruch University in Fall 2018.

Rowyda reported that Mr. Othman is "a very supportive Dad," who she "always goes to for help." She reported that throughout her education, when issues arise that Mr. Othman might not understand due to his "lack of education," he is "always willing to learn."

Rowyda reported that she had a "good" childhood. She recalled memories of going to the park and the bay with her father, as well as playing with LEGOS.

Rowyda reported that the knowledge of her father's offense conduct was "the most shocking thing I've ever heard." She reportedly "laughed at first" because she "did not believe it was real." She denied a history of childhood abuse of any kind.

Rowyda reported that since her father's arrest for the instant offense, he has "made a lot of improvements," that she has noticed, such as developing "self-realization skills." She reported that it appears he has reflected on his life and expresses a desire to improve himself.

## Ms. Nadya Othman

I conducted a collateral telephone interview with Ms. Nadya Othman on March 20, 2019. Nadya is Mr. Othman's third born daughter, who is 20 years old and resides in Staten Island, NY in her parents' home. She reported that Mr. Othman is a "great father." She stated, "Everything he does is for us." Nadya reported that he "worked so much" in order to afford the house he bought in Staten Island. She stated, "It's all because of him."

Nadya reported that Mr. Othman's arrest for the instant offense has "taken a toll on him." She stated, "He is a totally different person now…he knows he made mistakes." Nadya reported that Mr. Othman is "anxious" and "pre-occupied" with his legal situation. She added, "He needs to focus more on his mental health. He knows that now."

Nadya expressed concerns regarding her family's wellbeing if her father is sentenced to incarceration. She reported that Mr. Othman "doesn't belong in jail." She expressed that

*Forensic-Psychiatric Report*
*Hakmet Othman*

she is "worried about [her] little sisters growing up without a father." She stated, "A lot is going to change if he goes away…it is hard to picture how it would be without him."

## Mr. Larry Menzie, LCSW-R

I conducted a collateral telephone interview with Mr. Larry Menzie, LCSW-R, to gain insight into Mr. Othman's progress since beginning mental health treatment. Mr. Menzie is a counselor at Queens Counseling for Change, where Mr. Othman is currently attending group therapy services. Mr. Menzie reported that Mr. Othman has been attending group sessions since November 2018.

Mr. Menzie reported that Mr. Othman "came in skeptical," and showed slight resistance at the beginning; however, Mr. Menzie reported that "within six weeks" Mr. Othman became visibly engaged in treatment, such that he "cried" and verbalized that he "wished he started a long time ago." Mr. Menzie reported that Mr. Othman has started to "bridge some of the gaps as to why he did what he did." Mr. Menzie reported that Mr. Othman has alluded to a history of trauma, however, he has not disclosed abuse of any kind; which Mr. Menzie hypothesized was because it was within a group setting.

Mr. Menzie reported that Mr. Othman has been attending treatment on a regular basis and participates actively. He further described Mr. Othman as "open to treatment" and "cooperative." Mr. Menzie stated, "He [Mr. Othman] understands the seriousness of his situation and appears ready to face his issues."

## RESULTS OF PSYCHOLOGICAL TESTING

### Personality Assessment Inventory (PAI)

On January 24, 2019, Mr. Othman was administered the Personality Assessment Inventory (PAI), authored by Leslie Morey, PhD, which is a multi-scale pen and paper test of psychological functioning that assesses constructs relevant to personality and psychopathology evaluation in various contexts including psychotherapy, crisis/evaluation, and forensic assessment. The PAI has 22 non-overlapping scales, providing a comprehensive overview of psychopathology in adults. The PAI contains four kinds of scales, validity scales, which measure the respondent's approach to the test, including faking good or bad, exaggeration, or defensiveness; clinical scales, which correspond to psychiatric diagnostic categories; treatment consideration scales, which assess factors that may relate to treatment of clinical disorders or other risk factors but which are not captured in psychiatric diagnoses; and interpersonal scales, which provide indicators of interpersonal dimensions of personality functioning.

Mr. Othman's results on the PAI suggested that he might have had some difficulty attending appropriately and responded in an inconsistent fashion to similar items, which can

indicate a misunderstanding of the content. The test results were therefore invalid. Several potential reasons for this failure to attend include reading difficulties, careless or random responding, marked confusion or idiosyncratic item interpretation, or failure to follow the test instructions.[5]

## Abel Assessment for Sexual Interest-3 (AASI-3)

Mr. Othman was administered the AASI-3 for men on January 29, 2019. The ABEL Assessment is a psychological test for adult men and women with sexual behavior problems. It is designed to provide a self-report of a client's sexual arousal patterns, as well as an objective measure of their sexual interests. While the subjective measure provides a summary of what the client wishes to tell you about his or her arousal patterns, the objective measure provides an independent assessment of the client's sexual interests that is obtained in a way that is beyond the client's awareness. The AASI-3 is an empirically validated, comprehensive assessment that is specifically designed to measure sexual interest and obtain information relating to a number of abusive or problematic sexual behaviors.

Results of the AASI-3 show that Mr. Othman obtained a Cognitive Distortion Score of 25%, which is within the "non-problematic range" (0-25%) and indicates that he is unlikely to utilize justifications for his illegal sexual behavior. He obtained a Social Desirability Score of 50%, which is within the "problematic range" (46% to 64%). This scale is designed to measure a person's willingness to admit to any violation of common social mores.[6]

Within the AASI-3 is a Danger Registry measuring a person's attraction to, fantasies about, and sexual interest in young girls and boys sometime since the person turned 18 years old, concerns are registered when an answer is rated "completely true" or "somewhat true." Mr. Othman's results indicated there were no moderate or severe concerns raised regarding his sexual fantasies.[7]

Mr. Othman endorsed the item of Pornography Involving Children and Teens 17 Years and Younger, between the ages of 34 and 43, over which he expressed "absolute control"; he indicated that this behavior last occurred two years ago. In addition, he endorsed the item of Adult Pornography between the ages of 11 and 43 and reported to have "absolute control," and the item of Adult Internet Pornography between the ages of 30 and 43, over which he expressed "nearly complete control"; he reported that he used live web cameras and online sexual ads or services involving adult females over 18, for approximately 12 hours per week.[8] Mr. Othman endorsed the item of Sexual Affairs, between ages 20 and 43, over which he expressed "nearly complete" control; he reported that all sexual contact he has had was with women over the age of 18. He endorsed the item

---

[5] Personality Assessment Inventory, Clinical Interpretive Report, administered on 1/29/19, p 6
[6] AASI-3 Clinical Interpretative Report, administered on 01/29/19, p.12, 13
[7] AASI-3 Clinical Interpretative Report, administered on 01/29/19, p. 15
[8] AASI-3 Clinical Interpretative Report, administered on 01/29/19, p. 2

of Sex with Strangers between ages 21 and 30, over which he expressed "absolute control"; he reported that this behavior last occurred 15 years ago. He endorsed the item, Fetishism, between ages 11 and 43, involving women's lingerie, over which he expressed "absolute control."[9]

The Questionnaire for Sexual Abuse Victimization During Childhood and Emerick Sexual Victimization Scales on the AASI-3 indicate that Mr. Othman reported being sexually abused one time at age 7 by an adult male stranger. On the Trauma Symptomatology Scale, which examines the ways that a sexual abuse victim may misinterpret the process of abuse, cognitive distortions about violence, justifications enabling violence, and faulty beliefs about the world in general, Mr. Othman scored 44%, which indicates moderate concern (1-54%). On the Trauma Potentiators Scale, which measures the degree to which developmental and social issues are likely to aggravate trauma symptomatology, Mr. Othman scored 40%, which indicates moderate concern (1-59%).[10]

The results of the self-report section of the AASI-3 indicate that Mr. Othman has an elevated interest in the "Female age 14-17" range (6.33), the "Female Adult" range (4.17) and the "Female age 6-13" range (1.67). Mr. Othman's responses also indicated an elevated interest in multiple paraphilias with adult white women, including voyeurism (2.50) and fetishism (2.17).[11]

Finally, the AASI-3 results indicate that Mr. Othman's visual reaction time (VRT) ratio of children versus adults and adolescents places him at a high risk to re-offend. However, this metric is an estimation—other indices of risk, such as amenability to treatment, personality features, insight, and family support are not woven into this prediction model.[12]

**Bumby Cognitive Distortions Scales: The MOLEST Scale**

Mr. Othman was administered the Bumby MOLEST Scale on January 29, 2019. The MOLEST Scale is a 37-item self-report assessment which measures the presence and severity of cognitive distortions regarding sexual activity between adults and children. On a scale of 1 (strongly disagree) to 4 (strongly agree), Mr. Othman rated a "1" on 34 of the 37 items, which suggests that overall, he does not utilize maladaptive patterns of thinking to justify his behavior. He rated a score of "3" on two items: "22. During sexual assaults on children, some men ask their victims if they like it because they really want to please the child and make them feel good" and "27. Many men sexually assaulted children because of stress, and molesting helped to relieve that stress." Mr. Othman rated a score of "4" on the item which states, "Some men who molest children really don't like molesting children."[13]

---

[9] AASI-3 Clinical Interpretative Report, administered on 01/29/19, p. 2
[10] AASI-3 Clinical Interpretative Report, administered on 01/29/19, p. 9
[11] AASI-3 Clinical Interpretative Report, administered on 01/29/19, p. 16
[12] AASI-3 Clinical Interpretative Report, administered on 01/29/19, p. 16
[13] Bumby Cognitive Distortions Scales: The MOLEST Scale, administered on 1/29/19

## Adverse Childhood Experience (ACE) Questionnaire

Mr. Othman was administered the *Adverse Childhood Experience (ACE) Questionnaire,* a self-report assessment comprised of 10 items that assess for the severity and extent of adverse childhood experiences (that occurred when the respondent was 18 years old and younger), including physical and sexual abuse and neglect. A higher total score on the ACE Questionnaire indicates that the respondent experienced a greater range of abuse and trauma as a child. Mr. Othman earned a total score of 7, which indicates that he was exposed to a significant amount of adverse experiences when he was a child, which heightens his risk for psychological problems later in life. The items that he endorsed include the following:

- *Did a parent or other adult in the household often act in a way that made you afraid that you might be physically hurt?*
- *Did a parent in the household ever hit you so hard that you had marks or were injured?*
- *Did an adult or person at least 5 years older than you ever try to or actually have oral, anal, or vaginal sex with you?*
- *Was your mother often pushed, grabbed, slapped, or had something thrown at her? Was your mother sometimes or often kicked, bitten, hit with a fist, or hit with something hard?*

## MENTAL STATUS EXAMINATION

Mr. Othman is a 44-year-old Caucasian male of Palestinian decent, who presented for the examination alert and fully oriented, with an open demeanor. He was well groomed, casually dressed, and made appropriate eye contact throughout the evaluation. His speech was coherent and of normal rate, volume, and tone. Mr. Othman was cooperative throughout the interview process. His thought processes were logical, goal oriented, organized, and concrete. There was no evidence of a thought disorder.

Mr. Othman presented with a euthymic, fluctuating mood and his affect, or expressed emotional tone, was appropriate and congruent with his mood. He endorsed depressive symptoms and anxiety surrounding his current criminal proceedings. He became visibly upset when he spoke about the sexual abuse he endured as a child—his eyes were downcast and tearful, and his hands and legs were shaking uncontrollably.

Mr. Othman denied suicidal or homicidal ideation. He did not manifest, or endorse symptomatology characteristic of mania, or psychotic symptoms, such as hallucinations, delusions, or paranoia. He appeared to be of average intelligence and was intact cognitively.

## DIAGNOSIS AND FORMULATION

*Forensic-Psychiatric Report*
*Hakmet Othman*

## Unspecified Trauma-and Stressor-Related Disorder

Mr. Othman is a 44-year-old male of Palestinian decent, who currently resides in Staten Island, NY with his wife, brother, and five of his six children. He has been charged with possession and receipt of child pornography. I conducted a psychosexual assessment of Mr. Othman in an effort to gain a clearer understanding of any underlying psychological factors that may be directly related to his alleged offense conduct.

Mr. Othman and his family emigrated from Israel to Brooklyn, NY when he was five years old. His father reportedly physically and verbally abused him, his mother, and his siblings, on a regular basis throughout his childhood. Mr. Othman was sexually abused by a stranger when he was seven years old. While playing at the park with his friends, Mr. Othman was reportedly lured with candy into a strange man's car, at which time the man asked him to "duck down," and then drove to a remote location, under an overpass. The man pulled Mr. Othman's pants down and sexually assaulted him, while instructing Mr. Othman stick out his tongue and say, "I like it." Recalling the details of this incident during the present examination was visibly distressing for Mr. Othman, as he repressed this traumatic memory for decades until recently, subsequent to his arrest for the instant offense. He reported that his disclosure to this examiner marked the second time he had ever spoken in detail about the incident.

Subsequent to being sexually assaulted, Mr. Othman attempted to disclose the incident to his mother, but she reportedly did not believe him. Mr. Othman went home on the day of the assault and told his mother, "There is something wrong with my butt," to which his mother responded, "Stop being fresh." This invalidation forced Mr. Othman to suppress his memory of the assault, which consequently manifested itself as outbursts of uncontrolled anger and rage throughout his childhood, adolescence, and adult life. Throughout elementary school, beginning in second grade, Mr. Othman was involved in a multitude of physical altercations with peers. He was suspended multiple times in elementary school for "fighting" and one time in third grade for "kicking the windows out" of the school bus. His aggressive behavior continued in middle school and high school. He attended four different high schools by the time he reached 16 years old, at which time he dropped out of high school. Mr. Othman was first expelled halfway through tenth grade because he reportedly "exploded one day" and "slammed a table" on a peer's back. He subsequently attended three other high schools briefly before dropping out, for durations ranging from one day to three weeks, due to "fighting."

Mr. Othman's reported behavior in school represents a response to childhood sexual trauma that is not uncommon. Research on child victims of sexual abuse reveals that there is a "strong relationship between sexual abuse and emotional and behavioral problems."[14] Mr. Othman's abuse was neither validated nor treated until his arrest for the instant offense. His

---

[14] Garnefski, & Arends. (1998). Sexual abuse and adolescent maladjustment: Differences between male and female victims. *Journal of Adolescence, 21*(1), 99-107.

*Forensic-Psychiatric Report*
*Hakmet Othman*

uncontrolled rage continued into adulthood, as he reportedly continued getting into fights throughout his adult life. Mr. Othman endorsed ongoing symptoms characteristic of a trauma-and stressor-related disorder. He endorsed "recurrent, involuntary, and intrusive distressing memories"[15] of being sexually assaulted; he reported, "I always thought about ways to get it out of my head…I'd say to myself, *'think of something else, think of something else'*." He reported that he has "trust problems" and is consequently "overprotective" with his children. He endorsed feelings of paranoia when his children go anywhere on their own; he stated, "I always tell my wife, 'Somebody could take the kids'."

Following the incident of sexual abuse, Mr. Othman became sexualized at an early age, as a direct result of that early exposure. Mr. Othman was then exposed to pornography at age 11, also a pivotal time in his sexual development. Since then, he endorsed watching pornographic videos on a regular basis, until his arrest for the instant offense. He reported that he has always been "turned-off" by nakedness; he reportedly prefers to watch videos that depict women wearing lingerie. He reported that when he watched pornographic videos, if the woman in the video took all of her clothes off, he would stop watching the video. He stated, "I like lingerie, not nakedness." In reality, Mr. Othman reported that despite having sexual relations with multiple partners, he has never had sex with a woman who was completely naked; they "always leave their underwear on."

Mr. Othman reported that he was first exposed to pornography depicting underage girls while watching pornography featuring women of legal age, at which time an image of a young girl in a bikini "popped up," which prompted him to "click on it." He reported that he "found out she [the girl in the picture] was younger," however, he felt sexually aroused by the image and subsequently began looking at other images of "pre-teen legal models," which he explained were images of pre-teens wearing lingerie, labeled as "legal," "because they have clothes on." He stated, "At one point you start to like what you're looking at…before the computer it never came to my mind." Mr. Othman reported that he felt aroused by the images and videos of underage girls, despite "hating [him]self for watching." He stated, "I tried to stop every single time, but I couldn't." The strong possibility exists that early sexualization led to this interest in younger models, as might have his arranged marriage to a minor years ago.

Mr. Othman's first sexual encounter occurred when he was sexually assaulted at seven years old, which significantly impacted his development thereafter. This deviation from normal development is exhibited in his display of externalizing behaviors,[16] which manifested subsequent to his sexual assault and continued into adulthood, exemplified by uncontrolled anger and outward aggression. In some cases, childhood sexual victimization impedes sexual development and incites pedophilic-like interest such that the individual becomes attracted to children within the age group that they were a part of when they were sexualized as children. Clinical research on child pornography suggests that:

---

[15] American Psychiatric Association. (2013). Diagnostic and statistical manual of mental disorders (5th ed.). Arlington, VA: American Psychiatric Publishing.
[16] Externalizing behaviors are behaviors directed toward the external environment

*Forensic-Psychiatric Report*
*Hakmet Othman*

> ...the age of the chosen child [victim] is often revealed to be an indicator of the age of maximum developmental difficulties for the individual...suggesting that this was a developmental stage that could not be transversed and has become a point of fixation...there is some evidence that those who have experienced high levels of sexual stimulation in childhood may have a particularly strong association between childhood and sexuality. This may include, but not be limited to experiences of frank sexual abuse...there may be particular circumstances in which such experiences culminate in a paedophilic [sic] interest, for example, where those experiences have been associated with traumatic victimization.[17]

Because Mr. Othman endured traumatic sexual abuse a young age, it is my opinion that his sexual development was derailed from that point onward, due do his forced repression and lack of appropriate intervention. This deviation has manifested in Mr. Othman's habitual—nearly obsessive—viewing of pornography; his promiscuous sexual behavior during late adolescence and early adulthood, exhibited by numerous extramarital affairs; and most recently in his attraction to images and videos of young girls, which is indicative of the association between his childhood sexual trauma and his sexuality.

Mr. Othman's Abel Assessment for Sexual Interest placed him at a high risk to reoffend based on his visual reaction time ratio, which revealed an elevated interest in the "Female age 6-13" range. However, it is my opinion that his attraction to this age group represents the significant deviation in his sexual development that resulted from his falling victim to sexual assault at the age of seven. In other words, it is a manifestation of symptoms of sexual trauma that have never been treated rather than the manifestation of a sexual paraphilia, such as pedophilia. Although Mr. Othman admitted attraction to and viewed images of underage girls, there is no evidence that he ever acted on his attraction beyond looking at images. He is a father of six children, all of whom praised him as a father and provider.[18] In collateral interviews with Mr. Othman's wife and three oldest daughters, they expressed shock and disbelief when they were made aware of the details of his alleged offense. In addition, the risk level cited in Mr. Othman's Abel Assessment for Sexual Interest does not incorporate other mitigating factors of risk, such as his amenability to treatment, which he has expressed and demonstrated in his participation in group therapy at Queens Counseling for Change; his insight, which appears to have increased significantly since his arrest; and the familial support he continues to have.

It is my opinion, with a reasonable degree of medical certainty, that Mr. Othman suffers from ongoing symptoms indicative of a trauma-related disorder, due to the abuse he endured as a child, which were left unacknowledged and untreated until his arrest for the instant offense. The impact of childhood sexual trauma on his sexual development

---

[17] Wood, H. (2013). Internet pornography and paedophilia. *Psychoanalytic Psychotherapy, 27*(4), 1-20.
[18] Written Statements, authored by Deena Othman, Amena Othman, Rowyda Othman, Nadia Othman, Mohammed Othman, Mecca Othman, Subhi Othman, Diana Othman, & Medina Othman

significantly impacted his judgment and decision-making surrounding his alleged offense conduct.

Since his arrest, as attested to by his current group therapist and as manifested during my examination, Mr. Othman has begun to address the psychological underpinnings of his offense conduct. By acknowledging and addressing the sexual abuse he endured as a child, he is working towards to removing the key psychological factor that contributed to his offense conduct.

It is recommended that Mr. Othman undergo a course of intense individual psychotherapy in order to address and resolve the unexplored impact that his unresolved trauma had on his psychological development, in addition to continued sex-offender treatment, in order to facilitate his further understanding of the psychological underpinnings of his offense conduct and to develop more prosocial mechanisms to interact with the community. With such interventions in place, Mr. Othman's risk level can be immensely mitigated and he would then pose a low risk to the community.

Respectfully submitted,

Alexander Sasha Bardey, M.D.
Diplomate in Psychiatry, American Board of Psychiatry and Neurology
Diplomate in Forensic Psychiatry, American Board of Psychiatry and Neurology
Clinical Faculty, Department of Psychiatry, New York University Medical Center
Adjunct Assistant Professor, Department of Psychiatry and Behavioral Sciences
New York Medical College



# Queens Counseling for Change, LCSW, LLP

*Formerly Queens Center for Change*

8-14-20
To Whom it May Concern:

This correspondence is in regards to Othman, Hakmet (9-19-74). This is being written to update the Court regarding his time with the program and progress demonstrated. Mr. Othman has been enrolled since 5-12-17. He has attended with consistency and demonstrated through his participation in the treatment process his developed understanding and insights into the issues that led to his Court involvement. Prior reports have indicated his engagement and openness to utilizing the materials to explore the unhealthy dynamics present in his life that led to his arrest and treatment referral. He provides feedback that indicates he is adapting materials/concepts into his daily life such as stress management, healthier communication, understanding ones' emotions and how they drive behaviors, utilizing the emotional check in, creating a healthy support system and safety planning. He continues to adjust to the potential consequences of his arrest, possible incarceration and/or supervision while accepting responsibility for his actions.

In relation to dynamic risk factors, commonly accepted as predictors of progress and/or need, Mr. Othman would be placed in the "low" category from impressions at the agency, speaking with his wife and PO. While this report should not be considered a risk assessment the following will discuss how Mr. Othman's dynamic risk factors are low. (As a point of reference when discussing risk in the field of sexual violence it is not acceptable to state that someone is at "no risk".) Mr. Othman has maintained a stable relationship with his wife and family throughout his time with the agency discussing with emotion at times his understanding of how his actions have affected his family system. He has presented at the agency with proper impulse control, discussed in session his use of appropriate problem solving skills (home, work, community) and incorporating a healthier support system in his life to bring issues to as they arise. He indicated that prior to his arrest he was not open to using supports and often tried to solve problems on his own. He has not discussed nor does he appear to be sexually preoccupied or use sex as a coping mechanism. He has accepted responsibility for his actions and not minimized while discussing either in group or individual sessions. He has verbalized his understanding of the victimization of those in the images he viewed and appears to have developed empathy towards those who may be subjected to such abuse. He endorses prosocial behaviors and has kept consistent employment throughout his time with the agency. There is no note of substance abuse and no indicators have been observed while in treatment with the agency. He is supportive of his peers, accepts feedback without defense and encourages them to utilize the group process to make healthier, safer choices. There have been no known reports of non-compliance with supervision.

Should you need any further information related to his matter I can reached directly at Larry@QCFC.org with a duly executed release of information.

*Larry Menzie, LCSW-R (electronic signature)*

Larry Menzie, LCSW/R
Executive Director

*As a point of reference this writer is a licensed clinical social worker with over 25 years in the field. As a licensed social worker and administrator of Queens Counseling for Change I have overseen the treatment needs of thousands of individuals accused of, and having committed, sexually-related crimes. I am also a former New York State Parole Officer, and have worked with victims of sexual assaults as an Emergency Room Social Worker. Currently, I serve on the New York State Executive Board of the Association for the Treatment of Sexual Abusers and am the President of the New York State Alliance for the Prevention of Sexual Abuse. In relation to these organizations I coordinate the NYS annual conference focusing on treatment, supervision and research of sexual violence prevention.*

*Specializing in Forensic Social Work Services - Anger Management· Problematic Sexual Behaviors· Sexual Offenses*
*·Bias Crimes · Batterers · DWI Assessments*

30-46 Northern Blvd · Long Island City · New York · 11101
P-718-424-6191 · F-212-896-6530 · www.qcfc.org



From: **Leo V. Duval, Esq.** lvduvalesq@yahoo.com
Subject: **Othman letter 10.15.20.pdf**
Date: **Oct 18, 2020 at 6:43:28 PM**
To: **Zach Duval** zduvalp7@gmail.com

---

# First Light Psychological Services, P.L.L.C.

| 1111 Broadhollow Rd | **800-403-4360** | 120-34 Queens Blvd |
| Suite 204 | Fax: 1-888-509-0905 | Suite 300 |
| Farmingdale, N.Y. 11735 | | Kew Gardens, N.Y. 11415 |

October 15, 2020

Leo V. Duval Esq.
885 Annadale Road
Staten Island, NY 10312

Re:    Hakmet Othman
        DOB: 09/19/1974

Dear Mr. Duval,

Please be advised that the above client started weekly treatment on July 18, 2019. He has attended all scheduled session and participates during sessions.

Mr. Othman has started to address some of the triggers and thinking errors that contributed to his offense cycle. He is working on taking full responsibility for his actions without denying or minimizing his actions and how they had a negative impact on the victim.

Mr. Othman has made some positive progress in treatment. Once his case reaches a disposition, he will need to participate in a sex offender treatment program that encompasses individual and group treatment and polygraph examinations. .

If you have any further questions, please do not hesitate to contact me.

Sincerely,

Kathleen Castro, LMHC

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------X

United States of America                         :

-against-                                        :

HAKMET OTHMAN                                    :

Defendant                                        :

-------------------------------------------------X

Docket No: 1:18CR00098-001 (PKC)

# DEFENDANT HAKMET OTHMAN
# MEMORANDUM IN AID OF SENTENCING

## LEO V. DUVAL ESQ.

**Attorney for Defendant**
**HAKMET OTHMAN**
**885 Annadale Road**
**Staten Island, New York 10312**
**(718) 608-0200**
**(718) 966-5352 fax**
**duvalcriminaldefense.com**